David M. deRubertis, State Bar No. 208709
Shahane A. Martirosyan, State Bar No. 295471
**The deRubertis Law Firm**, APC
4219 Coldwater Canyon Avenue
Studio City, California  91604
Telephone:  (818) 761-2322
Facsimile:   (818) 761-2323
E-Mail: David@deRubertisLaw.com
E-Mail: Shahane@deRubertisLaw.com

Attorneys for Plaintiff
Tri Huynh

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRI HUYNH, | Case No.: |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | 1. Whistleblower Retaliation in Violation of the Sarbanes-Oxley Act (18 U.S.C. §1514A, et seq.); |
| WAL-MART STORES, INC., a Delaware Corporation; WAL-MART ASSOCIATES, INC., a Delaware Corporation; WAL-MART.COM, INC., a Delaware Corporation; and DOES 1 through 50, inclusive. | 2. Retaliation in Violation of California Labor Code §1102.5; |
| | 3. Disability Discrimination in Violation of California Fair Employment and Housing Act; |
| | 4. Failure to Accommodate in Violation of California Fair Employment and Housing Act; |
| Defendants. | 5. Failure to Engage in a Good Faith Interactive Process in Violation of the California Fair Employment and Housing Act; |
| | 6. Retaliation in Violation of the California Fair Employment and Housing Act; |
| | 7. Failure to Prevent Discrimination and Retaliation in Violation of the California Fair Employment and Housing Act; |
| | 8. Wrongful Termination in Violation of Public Policy. |
| | **(JURY TRIAL DEMAND)** |

- 1 -
**COMPLAINT**

**INTRODUCTION**

"Personal and moral integrity is one of our basic fundamentals, and it has to start with each of us."

"Don't compromise your reputation.  It's a precious commodity.  Don't compromise your integrity ... have a good name."

1.     These are the words of Wal-Mart founder Sam Walton who built Wal-Mart into America's largest corporation by recognizing that honesty and integrity were critical components of a long-term successful business strategy.  But this case shows that Wal-Mart has forgotten its roots and betrayed the principles of its Founder.  For the first time since it had become the undisputed champion of retail, Wal-Mart faced a serious long-term threat: Amazon.  Wal-Mart had been asleep at the wheel and was slow to react to the seismic shift in retail purchasing dollars away from traditional brick-and-mortar retail and into the land of E-commerce.  Wal-Mart sat there idly on the sidelines as Amazon built its business model around the fact that long-term retail success would be driven by E-commerce success.  By July 2015, Wal-Mart's world was rocked when Amazon's market capitalization exceeded Wal-Mart's.  Soon, a massive decline in Wal-Mart share value ensued.  Wal-Mart's senior leadership knew it had to act fast and decisively to swiftly change the short-term market perspective on its E-commerce progress to keep its share price up.  It thus embarked on an overly-aggressive push to show meteoric growth in its E-commerce business by any means possible – even, illegitimate ones.  In short, Wal-Mart sacrificed and betrayed its Founder's key principles of integrity and honesty, pushing those core values aside in its rush to win the E-commerce war at all costs.  In doing this, it realized it must silence any whistleblower who spoke up against its "win at all costs" approach to e-Commerce growth.  This case is brought by one of Wal-Mart's key E-commerce executives who refused to be silenced in the face of demands that he look the other way to unlawful conduct occurring with Wal-Mart's E-commerce business.

1

## JURISDICTION, VENUE AND EXHAUSTION

2      2.      This court has federal question jurisdiction based on 28 U.S.C. § 1331,

3   the Sarbanes-Oxley Act, 18 U.S.C. §1514A, et seq.  The first claim for relief arises

4   directly under federal law.

5      3.      This court has supplemental jurisdiction over the second through

6   eighth claims for relief pursuant to 28 U.S.C. § 1367.

7      4.      The City of San Bruno in San Mateo County, is where the majority of

8   the acts and omissions alleged occurred.

9      5.      Venue is properly laid in this District pursuant to 28 U.S.C. §

10   1391(b)(1) & (2).  The acts and omissions complained of herein occurred within

11   this District and this Division, and Mr. Huynh's employment was within this

12   District and this Division.

13      6.      Excluding interest and costs, the amount in controversy exceeds the

14   statutory minimum of $75,000.

15      7.      Plaintiff has exhausted any and all administrative remedies required to

16   file this complaint.  Plaintiff timely filed a complaint of Sarbanes-Oxley retaliation

17   with the United States Department of Labor and the Department did not issue

18   findings or recommendations within the statutory one hundred and eighty days, thus

19   permitting a direct lawsuit by Plaintiff in federal court.  Moreover, Plaintiff has

20   filed charges with the California Department of Fair Employment and Housing and

21   has received a "right to sue" notice from that agency.   Plaintiff has given notice of

22   his intent to seek remedies under the Labor Code Private Attorney Generals Act of

23   2004 (PAGA) with the Labor and Workforce Development Agency and is awaiting

24   the expiration of the statutory period.  Upon expiration of the statutory waiting

25   period, Plaintiff will amend this complaint to allege a claim seeking remedies under

26   PAGA.

27

28

**COMPLAINT**

1

**PARTIES**

2      8.      Mr. Huynh is a resident of the State of Washington.

3      9.      Defendants WAL-MART STORES, INC., a Delaware Corporation;

4  WAL-MART ASSOCIATES, INC., a Delaware Corporation; and WAL-

5  MART.COM, INC., a Delaware Corporation (collectively referred to as Wal-Mart),

6  are, and at all times relevant hereto were, a publicly traded company with securities

7  registered under section 12(g) of the Securities Exchange Act of 1934 ("the

8  Exchange Act").  Specifically, and upon information and belief, WAL-MART

9  STORES, INC., a Delaware Corporation, is believed to be the parent company of

10  wholly-owned subsidiaries WAL-MART ASSOCIATES, INC., a Delaware

11  Corporation; and WAL-MART.COM, INC., a Delaware Corporation.  At all times

12  herein mentioned, Wal-Mart was required to file periodic reports pursuant to

13  section 13 of the Exchange Act, including annual reports (10Ks), quarterly reports

14  (10Qs), and reports when certain events occur (8Ks).  These periodic reports must

15  include or incorporate by reference types of information that would help investors

16  decide whether Wal-Mart's securities are a good investment.  At all times herein

17  mentioned, Wal-Mart was also required by 15 U.S.C. §78m(b)(2) to "(A) make and

18  keep books, records, and accounts, which, in reasonable detail, accurately and fairly

19  reflect the transactions and dispositions of the assets of the issuer; and (B) devise

20  and maintain an adequate system of internal accounting controls sufficient to

21  provide reasonable assurances that – (i) transactions are executed in accordance

22  with management's general or specific authorization; (ii) transactions are recorded

23  as necessary (I) to permit preparation of financial statements in conformity with

24  generally accepted accounting principles or any other criteria applicable to such

25  statements, and (II) to maintain accountability for assets; (iii) access to assets is

26  permitted only in accordance with management's general or specific

27  authorization...."

28

10.    Moreover, at all relevant times, Wal-Mart was subject to the requirements of 15 U.S.C. §78m(b)(5), which prohibited attempts to "knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph 12."

11.    The true names and capacities, whether individual, corporate, agent, representative, or otherwise of defendants named herein as DOES 1 through 50, inclusive, are unknown to plaintiff at this time, who therefore sues these defendants by fictitious names.  Plaintiff will seek leave of court to amend this complaint to allege their true names and capacities once that information has been ascertained. On information and belief, and based on such information and belief, plaintiff alleges that each of the fictitiously named defendants is responsible in some manner, way or form and to some extent for acts, events and occurrences alleged in this complaint.  Wherever appearing in this complaint, each and every reference to "defendants" is intended to be and shall be a reference to all defendants in this action, and each of them, including but not limited to all fictitiously named defendants.

12.    Each of the defendants named herein was doing business as the agent, principal, servant, representative, employer, employee, joint venturer, partner, parent, subsidiary, affiliate and/or alter ego of each and every other defendant and in doing the things hereinafter alleged was acting within the course or scope of such authority as the agent, principal, servant, representative, employer, employee, joint venturer, partner, parent, subsidiary, affiliate or alter ego with the permission and consent of the remaining defendants.

## SUBSTANTIVE ALLEGATIONS

**A.    Wal-Mart's historical domination of the retail sector.**

13.    For years, Wal-Mart has dominated the retail sector as the undisputed champion of America's (if not the world's) brick-and-mortar retail market.

14.     Founded in 1962, by the late-1980s, Wal-Mart had become the most profitable retailer in America, beating-out then rivals Kmart and Sears though both had existed for decades longer than Wal-Mart.  By 1990, Wal-Mart was America's largest retailer by revenue and, by the mid-1990s, was widely recognized as America's largest, most dominant retailer.  It then began to expand internationally stretching into Mexico and Canada in the early- to mid-1990s and then spreading beyond North America into other continents in the mid- to late-1990s.

15.     By 2002, Wal-Mart achieved the top spot on the Fortune 500 list of America's largest corporations with annual revenue of nearly $220 billion and annual profits of $6.7 billion.

16.     By 2005, Wal-Mart reported $312.4 billion in annual sales, more than 6,200 facilities worldwide – including 3,800 stores within the United States alone – and it employed more than 1.6 million associates making it the largest private employer in the country and largest private corporation in the world.

17.     While Wal-Mart encountered its share of public relations and regulatory challenges during these years of rapid expansion and monumental growth, none of these challenges fundamentally threatened its status as America's most dominant retailer.  Even in the face of repeated and consistent public backlash against Wal-Mart's market-dominance strategies, Wal-Mart retained its indisputable status as America's largest, most dominant and most profitable retailer.[1]

---

[1]  Paragraphs 13 through 17 are plead on information and belief.

**B.     With the rise of E-commerce, Amazon becomes Wal-Mart's greatest long-term threat.  Wal-Mart knows this.  It is thus desperate to gain the ground it had long lost to Amazon as a result of Wal-Mart's "tortoise-like ... pace" in pursuing the online retail market.**

18.     Wal-Mart's path to market dominance was paved by its traditional brick-and-mortar retail business.  But as society has progressed and evolved technologically, so too have consumers' purchasing practices for both day-to-day necessities and luxury items.  With the rise of E-commerce – that is, online retail platforms – a growing segment of the purchasing dollars have shifted away from traditional brick-and-mortar purchases into the online retail space.  Each year, more and more purchasing power has been diverted away from traditional brick-and-mortar store purchases into the online E-commerce segment.  And each year, the predictions have been for this trend to continue at a more rapid pace year-after-year.

19.     For years, Wal-Mart's senior leadership recognized the trend: expansion of the E-commerce market with a corresponding contraction of the traditional brick-and-mortar market.  Eventually, E-commerce sales will likely exceed traditional brick-and-mortar retail sales.  Thus, senior leadership identified the need to catch-up in the E-commerce space, fearing that the growth of E-commerce competition, and Wal-Mart's "tortoise-like"[2] entry into the E-commerce sphere, posed the first serious long-term threat to Wal-Mart's retail market-dominance.

20.     By at least 2011 forward, Wal-Mart's senior leadership publicly, and repeatedly, acknowledged that its E-commerce business would continue to play an

---

[2]  *"Walmart Slowly Makes Strides in E-Commerce*," by Jennifer Saba.  *New York Times* (Dec. 27, 2016).   Found at:
https://www.nytimes.com/2016/12/27/business/dealbook/walmart-slowly-makes-strides-in-e-commerce.html

**COMPLAINT**

increasingly important role across its business segments.  Wal-Mart thus knew it needed to focus on and improve its E-commerce business to remain competitive on a long-term basis.  Yet, while Wal-Mart's senior leadership acknowledged the need to do so, it did not react swiftly enough to this long-term risk posed to Wal-Mart by this shift in purchasing dollars and customer focus away from traditional brick-and-mortar and into E-commerce.

21.    In 2014 and 2015, Wal-Mart's slow reaction to this significant shift in consumer purchasing practices towards E-commerce began to be more apparent, and to produce more immediate negative consequences.

22.    In February 2014, Wal-Mart announced its year-end Fiscal Year 2014 numbers, reporting a 5.7% drop in full-year net income, a 3.2% drop in full-year earnings per share and disappointing fourth quarter in-store sales.  Analysts and financial reporters continued to raise concern about Wal-Mart's long-term position following these reports.  Then, in February 2015, following Wal-Mart's report of its Fiscal Year 2015 year-end numbers – including that its E-commerce growth fell short of expectations – Wal-Mart's share price dropped 3% wiping out $6 billion in its market value.  Still, Wal-Mart's leadership continued to preach the message that Wal-Mart was well-positioned in the E-commerce space.

23.    At the same time, the market-leader of E-commerce (Amazon) reported continued meteoric growth.  On July 23, 2015, when Amazon reported a quarterly profit of $.19 cents per share (contrary to predictions of a loss per share), Amazon's stock price soared to a staggering number exceeding $560 per share.  Amazon's market capitalization of $262.7 billion now exceeded Wal-Mart's market capitalization of $233.5 by 12%.

24.    It was not just Amazon's growth that struck fear into Wal-Mart's senior leadership.  Amazon also showed other key signs of being well-positioned to maintain its status as the undisputed E-commerce champion into the future.  For

example, in 2014, an industry study reported that Amazon on average charged 9% lower than Wal-Mart for comparable products.

25.    Amazon had now solidified its status as the e-Commerce market-dominator, and its meteoric rise was widely noted by analysts who began to saturate the market with reports about the battle between Amazon and Wal-Mart for dominance in the E-commerce space.  Analysts and news reports began to depict Amazon's continued assault on Wal-Mart's role as the market-dominator in stark and understandable terms like that set forth below:



26.    For the first time in decades, Wal-Mart faced a real threat.  Analysts began to report that Wal-Mart may be in long-term trouble.  And Wal-Mart's stock began to plummet.

27.    By late-2015, Wal-Mart's stock price was in steep decline.  On October 18, 2015, Wal-Mart's share price dropped ten percent (10%) – its biggest single-day stock drop in twenty-five years – wiping out $21 billion in value.  In November 2015, Wal-Mart's stock price reached a historic low of just under $57 per share, stock price having dropped ten percent (33%) since January 2015.

28.    Bottom line: Having been late to the E-commerce game, Wal-Mart was continuously playing catch-up.  And Wal-Mart's senior leadership knew that if it did not seriously catch-up in the E-commerce race, Wal-Mart's long-term status as the undisputed champion of retail was in serious jeopardy.  And with any signs of long-term jeopardy or risk, the market would negatively react in the short-term causing a corresponding hit to the stock-price and immediate negative impact on the

incentive compensation pay-outs of senior executive leadership.  This is the backdrop that explains everything that follows.[3]

**C.    Wal-Mart pushes for massively aggressive E-commerce growth and paints a misleadingly optimistic picture of its progress.**

29.    Seeing the writing on the wall, Wal-Mart reacted by painting an overly-optimistic picture of its current status in the race to catch-up in the E-commerce space.

30.    Wal-Mart knew that – no matter how well it performed in trying to regain ground in the E-commerce land – at best, it would show only slow, incremental progress.  In other words, Wal-Mart knew that making true progress in closing the gap with Amazon could only be a long-term goal that would take many, many years.  But if Wal-Mart did not show a positive short-term picture, the result would be further dilution of its share value and corresponding hits to senior leadership's cashing-in on substantial incentive compensation.  Thus, Wal-Mart's senior leadership knew they had to manage the market's perception of its current and short-term progress in achieving its long-term goals.  Wal-Mart thus endeavored to paint an overly-optimistic picture of its current and short-term progress in the catching-up in the E-commerce space.

31.    This was the consistent message, and the company stuck to it whenever it could at all try to justify doing so.  Indeed, in Wal-Mart's view, there was no room for an alternative message.  If it wanted to preserve its status as the retail market-dominator, Wal-Mart had to convince analysts, investors, the purchasing public and the market that it could compete long-term with Amazon and others who dominated the E-commerce space.  It thus had a motive to silence anyone who questioned its core efforts to gain ground and meaningfully compete in the E-

[3]  Paragraphs 18 through 28 are alleged on information and belief.

commerce space – regardless of whether those questioning Wal-Mart's practices had valid, viable concerns.[4]

**D.**     **September 2014: Wal-Mart hires Tri Huynh as its Director of Business Development, Marketplace Business.**

**1.     Tri Huynh's background before Wal-Mart**

32.     Tri Huynh was born in Vietnam to parents who resided in Long Xuyen South Vietnam.  At twelve years-old, Tri Huynh was separated from his parents and sent to a refugee camp in Thailand with his aunt and two cousins.  In 1980, Tri Huynh was sponsored by his aunt's daughter who had previously immigrated to the United States right after the fall of Saigon to come to America.  He thus left Thailand and made his way to New York.

33.     Tri Huynh's family wanted him to immigrate to the United States for the same reasons as so many other American immigrants.  Their country was torn apart by civil unrest and America promised a brighter future.  Grateful for the opportunities that America promised, Tri Huynh worked hard to achieve the "American Dream."

34.     Tri Huynh spent his teenage years in a tough inner city neighborhood in Queens.  Struggling to master the English language, Mr. Huynh still graduated near the top of his high school class.  He then went on to obtain a Bachelor's of Engineering (B.E.) in Electrical Engineering, a Masters of Science (M.S.) in Manufacturing Engineering from New York University - Polytechnic School of Engineering and a Master of Business Administration (M.B.A.) with a focus on Strategy and Finance from Harvard Business School.

35.     Before he began at Wal-Mart, Mr. Huynh had a successful career as an executive building and leading business development and category management

_____

[4]  Paragraphs 29 through 31 are alleged on information and belief.

**COMPLAINT**

teams.  His experience ranged from up-and-coming start-ups to large international corporations.  Some of his key experience included:

● For approximately four years, Mr. Huynh led project teams at Booz Allen & Hamilton, a global management consulting firm, where he focused on solving complex business problems for clients in strategy development and operational transformation.  In this position, Mr. Huynh: designed and executed post-merger integration of key supported functions for a firm client; assisted in developing and implementing a transformative strategy to reduce substantially a client's overhead by operational standardizations and centralization; led a "turnaround" of a subsidiary of a multinational corporation focusing on redesigning the company's organizational structure and streamlining customer facing and support functions, etc.

● At Infosys Technologies, a large global IT consulting company, Mr. Huynh was responsible for managing and growing the profit and loss of multiple client accounts.   He was also involved in driving strategic deal pursuits using a consultative selling framework to target new strategic accounts.

● Mr. Huynh also served important roles in various start-up or fledgling companies including: (1) at Array Networks, he was a founding member focused on fund raising, strategic planning, product management and marketing; (2) at Motif, Inc., he served as Vice President of Strategy and Operations Effectiveness working directly with the Chief Executive Officer to develop and implement a turnaround and go-to-market strategy to drive accelerated revenue growth; and (3) at Mu Sigma, Inc., he served as Regional Head, Client Engagement where he was responsible for managing multiple

**COMPLAINT**

1    teams to deliver analytics projects for various clients to generate strategic

2    insights that drive action to enhance their business.

3

4    36.    Moreover, and most important from Wal-Mart's perspective, Mr.

5    Huynh spent approximately three years working as a Category Leader in Amazon's

6    Marketplace/3P Consumer Electronics Business.  In this role, Mr. Huynh: owned

7    the profit and loss for the Consumer Electronics 3P ("third-party") Business;

8    managed and lead teams that executed seller acquisition and scaling, selection

9    expansion, catalog data quality, and other similar duties.  In his work at Amazon,

10   Mr. Huynh gained experience that would be invaluable for Wal-Mart in its efforts

11   to ramp-up its E-commerce segment.  Specifically, at Amazon, Mr. Huynh had the

12   opportunity to work with two members of Amazon's senior leadership (S-Team

13   reporting directly to Amazon founder Jeff Bezos) where he learned firsthand how to

14   deliver value and drive a superior shopping experience for the customers.  He also

15   drove to fruition several strategic projects for Amazon – *e.g.*, led a twenty-one (21)

16   month project to develop and roll out a new Customer Electronics Accessories

17   category, etc.

18

19          **2.    Tri Huynh's hiring into Wal-Mart and its E-commerce**

20          **division.**

21   37.    On or about September 2, 2014, Mr. Huynh began working for Wal-

22   Mart's E-commerce division as its Director of Business Development Marketplace

23   Business.

24   38.    When he accepted the position at Wal-Mart, Mr. Huynh resided with

25   his wife and two children – then ages twelve (12) and fifteen (15) – in Seattle,

26   Washington.  Because his young children were settled in school at critical ages, he

27   and his wife were concerned about uprooting his family to relocate to California.

28   Instead, Mr. Huynh accepted the position working in San Bruno for Wal-Mart

1   commuting weekly at his own expense between San Bruno and Seattle leaving his

2   family each week to work for Wal-Mart.

3       39.    Wal-Mart's E-commerce division offers customers the ability to

4   purchase items online via Wal-Mart's website (www.Walmart.com) through two

5   different methods.  The first method – called "first party" or "1P" – involves Wal-

6   Mart offering its inventory of products direct-to-customer by the customer

7   purchasing an item via Wal-Mart's website.  Wal-Mart then fills and processes this

8   "first party" order through Wal-Mart's inventory and supply chain.  The second

9   method – called "third party" or "3P" – involves Wal-Mart permitting third-party

10  sellers to sell their products from their inventory via Wal-Mart's website.  In this

11  "third-party" or "3P" model, Wal-Mart provides "third-party" sellers the ability to

12  offer their products for purchase on Wal-Mart's "third-party" marketplace at

13  Walmart.com, and Wal-Mart then charges a commission to the "third-party" seller

14  for each completed sales transaction.  Wal-Mart's "third-party" E-commerce

15  business is referred to at times as its "Marketplace."

16      40.    At the outset, as the Director of Business Development, Marketplace

17  Business, Mr. Huynh's duties included both recruiting new "third-party"/"3P"

18  sellers and handling their onboarding once the new seller became an authorized

19  Wal-Mart "third party" seller through www.Walmart.com.  As the Director of

20  Business Development for the Marketplace business, Mr. Huynh led a team of

21  approximately forty (40) business development associates.

22

23      **E.    Mr. Huynh performs well, and Wal-Mart recognizes his positive**

24          **performance.**

25      41.    During his employment, Wal-Mart recognized and rewarded Mr.

26  Huynh for positive work performance.  For example, and not by way of limitation

27  but merely by way of illustration:

28

**COMPLAINT**

● On April 3, 2015, Mr. Huynh was given his Fiscal Year 2015 written performance evaluation.  In his Fiscal Year 2015 written performance evaluation, Mr. Huynh received an overall rating of "Solid Performer" and either "Exceeds Expectations" or "Solid Performer" in every single individual category.

● In October 2015, Mr. Huynh was granted a discretionary grant of two hundred thousand dollars ($200,000.00) worth of Restricted Stock Options (RSUs) in a special grant vesting over three years.  This RSU grant was not a required component of Mr. Huynh's compensation package.  Rather, it was a discretionary grant and Mr. Huynh, suggesting management's positive view of Mr. Nuynh's performance.

● In or about mid-2015 through 2016, Mr. Huynh was repeatedly selected to be a spokesperson for the Global E-Commerce Group to present to newly-elected officers who came to the San Bruno location where Mr. Huynh worked.

● In early-2016, Mr. Huynh was assured that if he met his year-end goal of recruiting three thousand (3,000) new sellers, he would be promoted to a Senior Director.

● In March 2016, Mr. Huynh was selected by Global Marketplace Senior Vice President Seth Beal (Mr. Huynh's then direct supervisor) and Suri Priya (VP of Human Resources) to attend the shareholder meeting in Bentonville in June 2016, which selection was approved by the Walmart.com leadership.

**COMPLAINT**

● In March 2016, Mr. Huynh was given his Fiscal Year 2016 written performance evaluation.  This evaluation was even better than his Fiscal Year 2015 evaluation.  Mr. Huynh received an overall rating of "Exceeds Expectations," and achieved one "Role Model," eight "Exceeds Expectations," and five "Solid Performer" individual category ratings.  The review confirmed that "FY 16 marked a significant success for Tri as a Marketplace leader and emerging organizational leader.  Tri was able to channel his high intellect and skill set to tackle challenging problems and objectives while continually adjusting in an environment of constant change.  He was able to drive material value to the goals, even beyond his immediate domain area, demonstrating his passion for the customer, seller, and the success of the Marketplace program.  He repeatedly took methodical analytical approaches to devise and revise strategies through the year, which places his team and function in position for continued success and rapid scaling.  Tri should feel very proud for exceeding his goals and competencies, and look to FY17 to continue his progress and develop a broader more far reaching leadership profile."  This review praised Mr. Huynh for his successful acquisition and onboarding of sellers which was noted to be "not only effective and accurate, [but it] also demonstrated Tri's strategic leadership, resourcefulness, and his ability to deviate from conventional approaches when necessary to create a new best practice."

42.     In short, Mr. Huynh performed well for Wal-Mart and Wal-Mart recognized his positive performance – that is, until Mr. Huynh refused to back-down when repeatedly instructed to stop raising concerns about conduct he reasonably believed violated the law within Wal-Mart's E-commerce business.

**COMPLAINT**

1
2
3
4

    **F.**    **Mr. Huynh observes, identifies and reports concerns that he reasonably believed were violations of the law.  Instead of meaningfully investigating his concerns, Wal-Mart retaliates against Mr. Huynh.**

5        43.    During his employment, Mr. Huynh observed and/or learned of what

6 he reasonably believed were violations of the law, which he disclosed and/or

7 reported to his superiors and others who had the authority to act upon his reports

8 and/or disclosures.  Mr. Huynh's conduct, his reports and his disclosures were

9 protected by SOX's anti-retaliation provisions because Mr. Huynh reasonably

10 believed the things he was reporting were, *inter alia*, violations of Wal-Mart's

11 internal controls, an indication that Wal-Mart failed to have or maintain proper and

12 sufficient internal controls, violations of generally accepted accounting principles

13 (GAAP), potential fraud against shareholders, potential securities fraud, and/or mail

14 and/or wire fraud, etc.

15        44.    One example: Mr. Huynh reported concerns about the design of, and

16 specifications used in, Wal-Mart's Global Marketplace Platform's (GMP),

17 including (but not limited to) the GMP's inability to categorize properly sellers'

18 products into the correct product contract categories.

19        45.    When a customer purchases a "third-party" seller's item on Wal-Mart's

20 online GMP, Wal-Mart charges a commission on the purchase to the "third-party"

21 seller.  The applicable commission percentage for the transaction is spelled-out in

22 the contract between Wal-Mart and the "third-party" seller.  When a transaction

23 occurs, Wal-Mart's online GMP categorizes the product sold into a product

24 category on a product-by-product basis.  Wal-Mart's online GMP does this through

25 a machine learning program that tries to identify the proper category for the item

26 upon each transaction being made.

27        46.    But Wal-Mart's online GMP's categorization process does not work as

28 well as it should work.  Rather, Wal-Mart's online GMP regularly fails to find the

1   correct category for the item, even though the correct category does exist and

2   should be found.  The result: the GMP categorizes the item as "unrecognized."

3      47.   The mis-categorization of products into an "unrecognized" category

4   typically results in charging an excessive commission fee because the default

5   commission percentage for "unrecognized" products was fifteen percent (15%).  In

6   contrast, many of the products that were truly driving Wal-Mart's GMV of its

7   online efforts were products that were subject to smaller commissions percentages.

8   For example, electronics and personal computers typically constitute a significant

9   percentage of Wal-Mart's GMP.  But these items tend to have smaller commission

10  percentages in the six to eight percent (6-8%) range.  Thus, by consistently mis-

11  categorizing these items, Wal-Mart charged excessive commission fees on them

12  (and many other items) to its third-party sellers.

13     48.   The Securities and Exchange Commission (SEC) regulations define

14  internal controls as including "a process designed ... to provide reasonable

15  assurance regarding the reliability of financial reporting and the preparation of

16  financial statements for external purposes in accordance with generally accepted

17  accounting principles...."  17 C.F.R. §240.13a-15(f).  These SEC regulations further

18  state that internal controls include "those policies and procedures that" ... "(1)

19  Pertain to the maintenance of records that in reasonable detail accurately and fairly

20  reflect the transactions and dispositions of the assets of the issuer; (2) Provide

21  reasonable assurance that transactions are recorded as necessary to permit

22  preparation of financial statements in accordance with generally accepted

23  accounting principles, and that receipts and expenditures of the issuer are being

24  made only in accordance with authorizations of management and directors of the

25  issuer ...."  17 C.F.R. §240.13a-15(f)(1), (2).  Here, while Wal-Mart's charging of

26  excessive commissions resulted from a system design flaw, it also exposed a failure

27  to have proper, robust controls and/or a control environment that would detect and

28  promptly remedy the problems.  These failures had a direct impact on financial

reporting because, by charging excessive commissions, Wal-Mart was actually over-stating its revenue to the extent that it would be later required to pay-back the excess commissions.  Finally, by listing and stating to sellers that the commission charged one be one amount, yet by knowingly continuing to charge a different amount, these acts could constitute mail and/or wire fraud.

49.    Mr. Huynh reported and disclosed his concerns that the GMP design and system flaws would cause negative consequences to Wal-Mart (and its shareholders), including, *inter alia*, because it would excessively mis-designate products as "unrecognized" products thereby overcharging third-party sellers. Overcharging sellers could create liability – including, but not limited to, mail and/or wire fraud liability for Wal-Mart – and it could overstate Wal-Mart's revenues to the extent that the improperly charged commissions were included on Wal-Mart's financials when, in fact, they were required to repaid back to the overcharged seller.

50.    Mr. Huynh's concerns about the improper design of Wal-Mart's GMP were not theoretical, nor were they misplaced concerns.  Rather, his concerns proved true.  As just one example, and not by way of limitation, but merely by way of illustration, in March 2016, a "third-party" seller reported to Wal-Mart that "commission accuracy is a big issue" and that it had sixteen (16) open tickets for commission errors in the last sixteen (16) weeks.  This "third-party" seller complained of having to spend a tremendous amount of time reconciling the commission fees charged by Wal-Mart to the "third-party" seller, and it estimated that only ten percent (10%) of the errors it spotted had been resolved.

51.    Mr. Huynh also learned of another problem within Wal-Mart's online Marketplace platform, including a major flaw or error within Wal-Mart's Pangaea system.  In or about March 2016, Wal-Mart received a complaint from a large third-party seller that Wal-Mart had failed to process three thousand (3,000) customer return orders.  Wal-Mart looked into the complaint and concluded that there was a

coding and system error within the Pangaea system that caused Wal-Mart to serially and systematically fail to process certain returns or refund orders from certain "third-party" sellers since September 8, 2015.  In short, Wal-Mart had improperly failed to process customer returns worth over seven million dollars ($7,000,000), which resulted in an inflation of GMV/sales by that amount from September 2015 through the discovery of the issue in March 2016.

52.    Suffice it to say, the above issues were warning signs of potentially serious problems within Wal-Mart's online Marketplace platform.  And they were also serious signs of Wal-Mart's failure to have proper internal controls for financial reporting purposes because, *inter alia*, Wal-Mart's existing control system failed to detect and/or remedy the problems on a timely basis.  Indeed, Wal-Mart's leadership internally described the nearly half a year failure to process certain "third-party" seller returns as a "colossal issue," and some within Wal-Mart acknowledged that these issues exposed the need to create an effective audit process within its Marketplace and to improve the existing controls within Wal-Mart's Marketplace.  Wal-Mart also internally questioned whether this failure to process returned item issues would require any additional, or corrected, financial reporting.  Bottom line: These issues implicated Sarbanes-Oxley compliance concerns directly.

53.    Throughout approximately March through May of 2016, Mr. Huynh continued to raise concerns and make disclosures about the above issues, pressing his superiors to address the bigger picture systemic flaws including the overall lack of effective internal controls regarding these issues.  Mr. Huynh continued to press forward his concern that if Wal-Mart did not properly address these issues, its failure to do so could have serious long-term implications for its critically-important E-commerce business.  Mr. Huynh also pressed the need to develop better internal controls for risk management, compliance and financial reporting purposes. In response, Mr. Huynh was told to stop raising these concerns and not to email at

all about them or document any similar concerns, and then he was retaliated against for continuing to press his concerns despite having been warned not to do so.

### G.    As Mr. Huynh continues to press his concerns forward, his management subtly turns on him.

54.    In early-2016, Marketplace Senior Vice President Seth Beal told Mr. Huynh that if he met his goal of recruiting three thousand (3,000) new sellers that year, he would be promoted the next fiscal year to Senior Director.  To that end, Mr. Huynh was told he would undergo a 360-degree feedback process in calendar year 2016 as a tool to prepare him for the anticipated promotion.

55.    To this point in his time at Wal-Mart, the message Mr. Huynh had been told by his superiors since his hire by Wal-Mart was clear: He was performing above expectations and he would continue to have a promising future within Wal-Mart's growing E-commerce business.  In fact, most recently, his FY 2016 performance evaluation specifically noted that "FY16 marked a significant success for [Mr. Huynh] as a Marketplace leader and emerging organizational leader," and acknowledged that Mr. Huynh should "look to FY 17 to continue his progress and develop a broader more far reaching leadership profile."

56.    But when, as discussed above, Mr. Huynh continued to press forward his concerns after he was told to stop doing so, things began to change.  First, Mr. Huynh's superior told him directly and emphatically to stop reporting or disclosing things like the above issues and to not email about any concerns of this nature.  In response to Mr. Huynh's continuing to raise these concerns, his direct supervisor threatened Mr. Huynh to "stay within your job's boundaries or I'll find someone else."  Second, instead of the 360-degree feedback being used as a tool to train him for the future promotion, Mr. Huynh learned from a member of his team that the 360-degree feedback process seemed designed to develop negative responses about Mr. Huynh more than anything else.  Third, Mr. Huynh began to be isolated from

certain projects, meetings or parts of the job – often, and not coincidentally, this

isolation had the effect of removing Mr. Huynh from areas of the job that would

have naturally led him to discover more and more of the above described problems

within Wal-Mart's E-commerce business.

**H.**     **Mr. Huynh gives notice of his ADHD disability.  Wal-Mart does not provide any accommodations.  Instead, his superiors continue to criticize him for disability-based conduct.**

57.     In late-May of 2016, after Mr. Huynh was criticized for refusing to follow the direction of "staying within the boundaries" of his job – even if that meant turning a blind-eye to concerns of unlawful conduct – Mr. Huynh shared with his direct supervisor and human resources that he suffered from a hidden mental disability – Attention Deficit Hyperactivity Disorder (ADHD).  Mr. Huynh provided his supervisor and human resources with a detailed presentation about his ADHD, his progress in trying to treat and manage it, and how it impacts his day-to-day behavior and functioning.  Mr. Huynh directly explained that his ADHD caused challenges and limitations in emotional self-regulation, but he also explained how he is and has been committed to improving himself in that regard.

58.     Neither human resources, nor anyone from Wal-Mart, offered any accommodations to assist Mr. Huynh.  Instead, later on, his management continued to criticize Mr. Huynh for disability-related conduct.

**I.**     **Fall of 2016: Senior leadership continues to report misleadingly optimistic E-commerce results to the investing public – still, based on indirect measures and notwithstanding the known (yet concealed) internal control and process and procedure failures.**

59.     Wal-Mart files consolidated financials for all of its business segments, each of which wrap-up to the parent company's financials.  Wal-Mart's E-

commerce business is a segment of Wal-Mart's global business.  Thus, Wal-Mart's E-commerce financial results are reported as part of Wal-Mart's overall operations within its consolidated financials and filings.  Therefore, Wal-Mart does not report to the investing public its actual E- commerce figures, nor does it breakdown the figures by "first-party" versus "third-party."  However, traditionally, "third-party" marketplaces tend to be far more profitable than a "first-party" online business.

60.    Consequently, when the investing public tries to determine the success or failure of Wal-Mart's E-commerce business, it must do so inferentially by extrapolating from indirect measures (*e.g.*, SKU number growth, seller number growth, GMV, etc.) rather than by simply reviewing actual, published financial results specific to the E-commerce segment and distinguishing between "first-party" versus "third-party" figures.  Wal-Mart thus has an incentive to boost-up these indirect measures of the profitable "third-party" business even if doing so does not actually substantially contribute to Wal-Mart's actual E-commerce success.  By boosting-up these indirect measures, Wal-Mart paints a picture of E-commerce growth and success (including specifically in the typically more profitable "third-party" Marketplace) that, in fact, misleads the investing public.  And, these indirect measures are easy to manipulate to produce the appearance of growth even if the legitimate and sustainable growth is not truly occurring.

61.    Keenly aware of the importance of these indirect measures, in the second half of 2016, Wal-Mart's leadership continued to report massive growth in them to the investing public.  For example, and not by way of limitation but merely by way of illustration: In its August 18, 2016 second quarter FY17 earnings call, Wal-Mart's Chief Executive Officer Doug McMillon reported that Wal-Mart had added seven million (7,000,000) SKUs to its Marketplace offerings since the beginning of the year and now reached fifteen million (15,000,000) SKUs on its Marketplace.  Thus, forty-six percent (46%) of the total SKUs Wal-Mart then offered were newly-obtained within the last eight (8) months.

62.     Likewise, in an internal communication in early-October 2016, one senior leader within Wal-Mart's E-commerce business boasted that the "third-party" Marketplace had reached two thousand and seventy-four (2,074) sellers up from a mere one hundred and eighty (180) at the beginning of the year, that it expected to reach three thousand (3,000) sellers by the Holidays.  This same senior leader also reported and boasted that Wal-Mart currently had sixteen million five hundred thousand (16,500,000) unique SKUs compared to six million two hundred thousand (6,200,000) at year's beginning.  Mr. Huynh realized these numbers would be later reported to the public in a quarterly earnings call or otherwise.

63.     Even these massive growth results were not enough in senior leadership's eyes.  After all, to Wal-Mart, nothing was enough in its race to regain lost ground in E-commerce.  When Mr. Huynh's recruiting team crushed aggressive targets, leadership just responded by increasing targets even more.  Thus, for example and not by way of limitation but merely by way of illustration, while the goal for seller recruitment at Fiscal Year 2017's beginning (in March 2016) was to recruit an additional three thousand (3,000) new "third-party" sellers, that goal more than doubled during the fiscal year to a goal of recruiting seven thousand (7,000) new "third-party" sellers.

64.     Mr. Huynh became increasingly concerned that the pressure to boost these indirect measures (*e.g.*, total number of sellers, total SKU numbers, etc.) was being met, at least in part, by improperly sacrificing quality by lowering standards for product listings and then failing to properly monitor the "third-party" seller's performance, and product listings, through a robust control system after the seller went live on Wal-Mart's Marketplace.  An online Marketplace provider like Wal-Mart must balance the desire to have a large number of third-party sellers (and, therefore, likely a greater number of products as well as greater product availability) against the need to ensure quality sellers.  Poor quality sellers – *e.g.*, poor customer service, excessive prices, low-quality products/SKUs, etc. –  can impair the

customer experience and hurt customer development and retention.  Failing to properly monitor poor quality "third-party" sellers can also result in those sellers listing inappropriate products and/or having their redundant SKUs improperly counted as unique SKUs (thereby falsely inflating SKU growth).  Wal-Mart's rush to appear in the short-term to be making astronomical strides in gaining ground long lost to Amazon made it reduce "third-party" seller standards to the point of compromising its Marketplace quality, thereby compromising and jeopardizing the Wal-Mart's online Marketplace.

65.    Mr. Huynh had previously reported concerns that the reduction in "third-party" seller pre-launch or go-live standards to accelerate the speed by which the sellers go-live on Wal-Mart's Marketplace (thereby boosting total SKUs, etc.) would result in lower-quality sellers and SKUs infiltrating Wal-Mart's Marketplace. Mr. Huynh also expressed concerns that this was being done in an environment which already lacked proper controls to mitigate against potential risks of this speedy ramp-up of go-live acceleration.

66.    In fact, as Mr. Huynh knew, by early-October 2016, Wal-Mart's E-commerce senior leadership could not deny the existence of these serious control problems.  For example, the same senior leader who boasted in early-October 2016 that the "third-party" Marketplace now had two thousand and seventy-four (2,074) and sixteen million five hundred thousand (16,500,000) unique SKUs acknowledged in this same supposed "good news" report that Wal-Mart's E-commerce business had hit "some headwinds in the past couple of weeks" including that: (1) Wal-Mart had to suspend its third-largest "third-party" seller as a result of continued and repeated problems with poor customer service and an excessively high cancellation rate; and (2) Wal-Mart's Marketplace had suffered serious public embarrassment when inappropriate items were listed on its Marketplace by "third-party" sellers.

**COMPLAINT**

67.     Among other things, and merely by way of example and not by way of limitation, Wal-Mart's online "third-party" Marketplace had items listed such as:

● "Tranny Granny" Costume: An offensive, inappropriate Halloween costume mocking transgender people:



● "Razor Blade Suicide Scar Wound Latex Costume Make Up": A highly disturbing supposed Halloween costume that mocks and makes light of the tragedy of suicide and the challenge of mental health struggles:



68.     Wal-Mart cannot defend products like this being listed on its site, nor did it in real-time.  Rather, it removed these items (belatedly) and publicly acknowledged that they were inappropriate and never should have made their way

onto Wal-Mart's online offerings.  For example, Wal-Mart has described the suicide costume as "appalling" and "unacceptable for a third-party seller to list it on our marketplace," which "clearly violated our prohibited items policy...."

69.     But, Wal-Mart's action was too little, too late.  It had already failed to prevent these inappropriate items from being listed on its site, and the public backlash to Wal-Mart's failure was already occurring as various media outlets reported that these inappropriate items were listed on Wal-Mart's online Marketplace.

70.     Worse, while it acknowledged the inappropriate nature of these and other product listings, Wal-Mart continued to fail to address, or to address adequately, the underlying source of the problem.  The aggressive push to ramp-up the indirect measures of E-commerce success (*e.g.*, SKU numbers, etc.) – including without proper controls in place to monitor them – had allowed unproven sellers to list low-quality assortments/SKUs resulting in their inappropriate products infiltrating Wal-Mart's online Marketplace.

71.     With time, Mr. Huynh came to conclude that Wal-Mart was intentionally pushing for massive growth of these indirect measures (*e.g.*, SKU growth, etc.) as a way to misleading the investing public because Wal-Mart's E-commerce leadership knew that these indirect measures did not tell the true picture of the state of Wal-Mart's E-commerce growth and actually overstated that growth. One way to rapidly increase the number of SKUs offered was to rapidly recruit new "third-party" sellers all of which would bring a series of new SKUs onto Wal-Mart's Marketplace.  The more "third-party" sellers operating in Wal-Mart's Marketplace, the more growth in SKUs would result.  Yet, Mr. Huynh came to conclude that Wal-Mart's rapid push to recruit, without proper support post-recruitment, led to Wal-Mart falsely reporting its SKU growth, *inter alia* and not by way of limitation by: (a) covering-up the inability to properly scale for the majority of sellers post-recruitment, Wal-Mart resorted to catalogue stuffing – that is,

allowing a small number of lower-quality "third-party" sellers to upload a massive number of SKUs without ensuring the SKUs were quality (*e.g.*, relevant to customer, excessive pricing, buyable, etc.); (b) listing redundant SKU numbers (that is, identical SKUs were being treated as different, separate SKUs); and (c) allowing non-buyable SKUs to be included in its total Marketplace SKU count.  Moreover, with the continued push to recruit at a meteoric pace, but without a corresponding ramp-up of back-end support at onboarding and seller management stages, these problems would simply continue and compound on themselves.  In short, Wal-Mart was reporting a misleading picture of its online Marketplace growth.

**J.    Fall 2016: Mr. Huynh continues to press his concerns.  Wal-Mart swiftly responds with more retaliation.**

72.    Also during this time period and in recent months, Mr. Huynh continued to learn of both continued, as well as other troubling, concerns.  For example, and without limitation and merely by way of illustration:

● Some sellers continued to report that Wal-Mart had continued to fail to timely pay it or them.

● In September 2016, a "third-party" seller reported continued examples of Wal-Mart's failure to pay the proper and correct commission rates.  Specifically, the seller provided evidence that Wal-Mart's online platform stated that the commission rate Wal-Mart charged the "third-party" seller on a cell phone purchase would be fifteen percent (15%) – contrary to other documents and Wal-Mart's representations that stated that a cell phone commission rate of eight percent (8%).  Then, when the seller brought this to the attention of Wal-Mart, the internal dialogue within Wal-Mart revealed that certain associates within Wal-Mart's E-commerce business claimed to

believe that the erroneous fifteen percent (15%) commission rate was actually correct.  By this time, Mr. Huynh's concerns about the commission overcharge issue had become more serious in his mind.  He had originally reported these concerns as early as December 2014.  He then reiterated them in writing in December 2015.  By March 2016, there were clear and documented examples of this issue occurring.  Yet, six months later, Wal-Mart had not remedied the problem nor, to Mr. Huynh's understanding, had it taken serious and suffcent steps to try to remedy it.  Given the entire history of the issue, Mr. Huynh had come to conclude that Wal-Mart had intentionally perpetrated this fraud or, at least, intentionally allowed it to continue after knowing it was occurring.  Indeed, by continuing to represent a certain commission percentage for certain items to "third-party" sellers, while knowing its system would often overcharge, Mr. Huynh was concerned that Wal-Mart was committing a continuing mail and/or wire fraud: lying to the "third-party" sellers about what commission rate it would actually charge and then actually charging a higher commission.

● In September 2016, as part of the Marketplace's review of its third quarter FY2017 progress, Mr. Huynh received confirmation that:

- Wal-Mart recognized that it needed to reduce its "refund failure rate." Specifically, Wal-Mart acknowledged its need to "[i]dentify root causes of GMP refund 'failures' and work with internal teams to resolve and implement future prevention steps."  In other words, Wal-Mart recognized a known weakness in its E-commerce internal controls that needed to be fixed because it continued to leave the company vulnerable.  Yet, though the issue was identified in March

2016, half a year later the "status" on this necessary control fix was merely that Wal-Mart was now "ready to start."

- Wal-Mart likewise recognized that it needed to achieve a "resolution of chronic tech issues" and, to do this, it needed to "[l]everage data to drive resolution on chronic issues."  Even though this was admittedly a "chronic issue" – yet again – the status of this critical need was merely "ready to start."

- Wal-Mart recognized that it needed to increase its seller satisfaction scores by identifying, investigating and resolving "issues driving low seller satisfaction," but – yet again – this chronic, longstanding issue was merely determined to be merely "ready to start."

- Wal-Mart similarly recognized it had needed to "improve level of support to Category Managers" by, among other things, revising its relevant internal controls so that they were based on Marketplace-centric parameters, which it had previously failed to do.

- Wal-Mart also recognized the need to "[r]educe customer escalation rate" by identifying "poor performing sellers" and getting back to its roots of having a "customer-centric focus," which its E-commerce business had not lived up to.

73.    In or about October 2016, Mr. Huynh (contrary to his boss' demand) steadfastly pressed forward his concerns about, *inter alia*: the lack of proper controls and weaknesses within Wal-Mart's internal controls; commission overcharging concerns; structural flaws with Wal-Mart's online platform which

1    were still unresolved and also exposed a lack of sufficient controls; Wal-Mart's

2    inability to scale at the rate being demanded in terms of E-commerce growth – that

3    is, the disconnect between the recruitment pace and the post-recruitment ability to

4    onboard and manage the "third-party" seller quality; timely payment issues;

5    misrepresentation of Wal-Mart's Marketplace true growth to the public; etc.  Mr.

6    Huynh raised these issues at this time both with his direct supervisor (who again

7    told him to just worry about recruiting more sellers and not worry about what

8    happens after recruitment) as well as with others.

9         74.    Among other things in or about October and November 2016, Mr.

10   Huynh disclosed that there was a serious disconnect between the push to continue

11   recruiting new "third-party" sellers at a meteoric pace, and the ability of the

12   onboarding and seller management teams to support that rapid seller growth.  Yet,

13   Wal-Mart continued to paint an overly-optimistic, misleading report about the

14   success of Wal-Mart's rapid Marketplace expansion.  In Mr. Huynh's words, it was

15   like his business development (recruitment) team was at the front end operating

16   with a twelve inch pipe but then the pipe narrowed to a two inch pipe in the back-

17   end – hence, the systemic commission accuracy issues, seller satisfaction issues,

18   reputational issues, refund and payment issues, etc.  Mr. Huynh expressed concerns

19   that the "pipe was going to burst," all of which would expose that Wal-Mart was

20   painting a false rosy picture about the status of its E-commerce business through the

21   inflation of the indirect measures like SKU growth.  Mr. Huynh also reported his

22   concerns that negative word of mouth would spread through the seller community

23   that Wal-Mart ripped-off "Mom and Pop" sellers by overcharging commissions or

24   that, through the relaxed pre-launch/go-live standards necessary to achieve the rapid

25   growth management demanded, had allowed price-gouging sellers into its

26   Marketplace contrary to Wal-Mart's fundamental message: Save Money, Live

27   Better.

28

75.     In or about September 2016, Wal-Mart acquired one of its competitor online marketplaces (Jet.com) for $3.3 billion dollars.  Going forward, the plan was to integrate some aspects of Jet.com and Walmart.com.  The Jet.com team, and the Wal-Mart E-commerce team, would work together in some respects.  Among other things, Wal-Mart's E-commerce business would now have a new set of eyes looking over it – those of Jet.com's Founder Marc Lore who became Wal-Mart's Chief Executive Officer (CEO) of E-commerce U.S.  This created an additional incentive for those who had created, contributed to, ignored, and/or allowed the concerns Mr. Huynh had pressed forward to continue without appropriate, timely fixes to hide or conceal their failures, and get rid of anyone who might expose their failures to new management.  Presumably realizing that a fresh set of eyes may see things the way Mr. Huynh's eyes had seen them, soon after Mr. Huynh reiterated the above concerns to his boss in early-October 2014, Mr. Huynh's boss circulated an email acknowledging some of the concerns and asking questions like whether: "commissions [are] being correctly charged?"; "our financial systems correctly report[] commissions?,"; "our management systems [are] correctly reporting commissions"; etc.

76.     But even though at least some of Mr. Huynh's concerns were thereby at least indirectly acknowledged by his superior to be valid and legitimate, his superiors were angry and annoyed at him for continuing to raise them – especially, because his direct boss had told him to stop doing so.  They also knew or suspected that he would likely continue to express these same concerns to the new management team from the Jet.com acquisition if he continued to work with the new Jet.com team long enough.  Thus, not surprisingly, the retaliation swiftly followed his continued raising of these issues (upon information and belief, likely to discourage him from reporting them to any new set of ears from the Jet.com management team).

**COMPLAINT**

77.     For example, not by way of limitation but merely by way of example: In or about mid-October 2016, Mr. Huynh (in a meeting with a human resources representative) was accused of engaging in misconduct at a trade show.  The accusation was either manufactured or blown out of proportion; the benign accusation did not rise to the level of justifying discipline.  Likewise, around this same time Mr. Huynh was accused of a mishap during a press interview at a trade show.  This, too, was an unfair attack.  Nonetheless, ultimately, on November 17, 2016, Mr. Huynh was presented with a "Written Warning (Coaching)" that made bogus attacks on him – including the bogus allegation that his conduct at a conference had "ultimately put into question [his] ability to exercise good judgment" and that his "documented behaviors and comments were inconsistent with [his] responsibilities as the leader of the Marketplace Business Development Team."  The write-up was the combined effort of Mr. Huynh's direct boss and human resources.  According to Wal-Mart's policies, this write-up would remain on Mr. Huynh's record for one year and would prevent or impede his ability to transfer, promote, etc. during that one year period.

78.     The bogus write-up, alone, was bad enough.  It was not deserved but instead was retaliatory for the ongoing disclosures of the above concerns.  But, adding insult to injury, Wal-Mart also demanded that Mr. Huynh take a generic training course on "Emotional Intelligence" given to supervisors as part of basic management training.

79.     "Emotional intelligence" is defined as "the capacity to be aware of, control, and express one's emotions, and to handle interpersonal relationships judiciously and empathetically."  But, Mr. Huynh had specifically shared with his direct boss and human resources that emotional regulation and impulse control were symptoms of his underlying ADHD disability – indeed, he had even presented a Powerpoint presentation about his condition to them in an effort to educate them about his struggles with his disability.  To the extent that there were any real issues

**COMPLAINT**

involving Mr. Huynh's emotional regulation or impulse control, they should have been dealt with through a proper interactive process that was appropriately tailored to his specific disability. But, instead, his disability's role was being ignored and he was told he must take this course that was inappropriate for him under the circumstances of his disability.

80.   Moreover, the bogus allegations leveled against him in the November 2016 write-up were not issues of "emotional intelligence," emotional regulation or impulse control. Thus, forcing him to attend an "emotional intelligence" class was a non-sequitur in terms of addressing the purported issues set forth in the November 2016 Written Warning.

81.   After the November 2016 write-up, Mr. Huynh reported both to his direct boss, and to human resources, that he believed he had been subject to discrimination based on his disability and that the discipline was discriminatory and retaliatory. He made such reports or protected opposition on multiple occasions thereafter.

**K.   November - December 2016: Mr. Huynh continues to see more and more troubling information, and he continues to make protected disclosures.**

82.   In November and December 2016, Mr. Huynh continued to observe more of the same type of troubling concerns, as well as others, including by way of illustration and not by way of limitation, the examples set forth below.

83.   Seller feedback indicated that Wal-Mart's Marketplace was incorrectly merging product listings. Wal-Mart's system was treating variations of the seller's products as all being one single and identical product type when, in fact, they were different variations of a single product type. The customer also explained to Wal-Mart the "[r]amifications if this [issue] is not fixed" – including that:

● "Customers will regularly receive incorrect orders, disappointing them, and perhaps making them go elsewhere."

● "Merchants will have to deal with a greater number of returns & refunds than necessary, raising costs."

● "Merchants will be forced to cancel more orders than necessary, skewing your metrics."

● "If the scope of the problem turns out to be really bad, and unfixable, it might force larger merchants to withdraw form the marketplace to avoid problems with automation.  It is impossible to scale order management when every single order needs to be human checked for accuracy."

84.    This customer further warned Wal-Mart that others could not "take on Amazon ... only Walmart can.  But if too many customers have bad experiences purchasing products from third party merchants due to data problems ... Walmart will not win this battle."

85.    Also in December 2016, Wal-Mart received reports of more "third-party" seller discontent because Wal-Mart had failed to pay, or failed to correctly pay, sellers.  This particular week, the aggregate amount of seller payments Wal-Mart was required to make was its single-week largest to date.  Wal-Mart's payment system "failed under that much load" due to the "payment system being unreliable."

86.    Still, despite these and other known systemic post-recruitment scalability problems that were continuing to be exposed, management still demanded even more aggressive E-commerce growth.  The Fiscal Year 2018 Plan set operational targets of ending Fiscal Year 2018 (*i.e.*, February 2018) with twenty

thousand (20,000) Marketplace "third-party" sellers and one hundred million (100,000,000) SKUs – this, even though the Marketplace's control system was still showing significant weaknesses and/or voids.

87.     Mr. Huynh also continued to see more and more evidence confirming his previous beliefs that senior leadership was presenting a false, overly-optimistic view of Wal-Mart's E-commerce growth.  For example, in its November 18, 2016 third quarter FY17 earnings call, Wal-Mart's Chief Executive Officer Doug McMillon began his portion of the earnings report highlighting "some recent developments in e-commerce" including that Wal-Mart was "scaling fast – adding 8 million SKUs over the past 3 months alone" within its Marketplace.

88.     But just a month or so later, Mr. Huynh observed an internal presentation where it was reported that "[s]eller SKU ramp up [was] not progressing as aggressively as we would have liked," which was attributed to the fact that "[m]any sellers aren't ramping up their SKU count to the number of SKUs committed in their applications."  This internal presentation was contrary to the message being delivered externally.  In other words, there was a disconnect between what Wal-Mart was telling the investing public about its SKU ramp-up versus what Wal-Mart internally recognized was actually the case.

89.     Indeed, Wal-Mart was misrepresenting the true SKU count numbers including, by way of illustration and not by way of limitation:

● Wal-Mart's publicly reported SKU numbers include SKUs that are not actually buyable to the public via its Marketplace.  That is, Wal-Mart reports to the public the SKU totals listed in its internal product catalogue databases.  However, significant portions of the SKUs listed in Wal-Mart's internal product catalogue databases are not offered to the public to be purchased on the Marketplace.  That is, the SKUs are not buyable.  By reporting to the public SKU growth numbers that includes non-buyable SKUs not even listed

for purchase on the Marketplace, Wal-Mart was misrepresenting its true SKU growth.

● A significant portion of Wal-Mart's reported massive SKU growth during Fiscal Year 2017 was attributable to Wal-Mart's acquisition of Jet.com and its product listings.  Indeed, Wal-Mart's Fiscal Year 2017 Annual Report reported that "[t]he acquisition of jet.com is in line with the Company's strategic framework of accelerating e-commerce growth."  But in conducting post-merger due diligence and strategy research, Mr. Huynh compared internal salesforce.com data for Jet.com and Walmart.com.  Mr. Huynh determined that a high percentage of the product sale lists between Jet.com and Walmart.com overlapped – that is, they contained redundant SKUs.  Yet Wal-Mart was reporting the redundant SKU numbers as if they were separate, non-redundant, thereby misrepresenting and artificially and falsely inflating SKU growth numbers.

90.    Likewise, Mr. Huynh continued to see evidence that the lowering of seller go-live or pre-launch standards had continued to bring low-quality sellers into Wal-Mart's Marketplace.  Some examples – again, merely by way of illustration and not by way of limitation:

● Wal-Mart continued to be plagued by offensive and inappropriate products being listed on its Marketplace, such as mugs displaying the offensive phrases "got hitler?" and "got retard?":



**COMPLAINT**

1

2

3

4

5



6      91.     The foregoing concerns were material in that, *inter alia* and not by way

7  of limitation but merely by way of example, they would influence the judgment of a

8  reasonable investor.  Among other things, and not by way of limitation but merely

9  by way of example:

10

11      ● Wal-Mart's E-commerce business is recognized by Wal-Mart, and the

12      investing community, as a key component of Wal-Mart's future success –

13      indeed, perhaps more so than any other segment of Wal-Mart's operations.

14      Wal-Mart's leadership has repeatedly publicly emphasized the long-term

15      importance of its E-commerce growth including "organic growth" in Wal-

16      Mart's profitability outlook.  And, in doing so, Wal-Mart's senior executives

17      have repeatedly and consistently highlighted the indirect measures such as

18      SKU growth as signs of the compnay's positive profitability outlook.

19

20      ● Given the critical role of its E-commerce business in long-term profitability

21      and success, Wal-Mart knew and expected that statements regarding its E-

22      commerce growth or lack thereof would produce either a positive or negative

23      market-reaction.  Analysts consistently considered Wal-Mart's E-commerce

24      growth in analyzing whether to buy or sell Wal-Mart stock.

25

26      ● Product assortment and SKU growth – including the inflated SKU numbers

27      – have been relied on by key analysts in evaluating Wal-Mart's stock.  For

28      example, and not by way of limitation but merely by way of illustration, Bank

of America Merrill Lynch gave a positive buy rating and reported that Walmart "remains a top pick" relying on Wal-Mart's representation that "the majority of Walmart's US online growth was organic and came through Walmart.com and was supported by" four factors with the first listed factor being "continued marketplace expansion (now 40mn online SKUs vs. 35 mm in F4Q and 10mn last year ...."

● In recent times, discussions between analysts and Wal-Mart's management have largely focused on Wal-Mart's E-commerce performance and outlook more so than any other single segment or factor in Wal-Mart's business.

● Upon information and belief, some of the misrepresentations may have been essential to management's hitting incentive compensation.  They thus were a strategy of "earnings management" to maximize the likelihood of executives hitting incentive compensation targets.  In some of the relevant time periods, Wal-Mart's senior executives narrowly hit their financial incentive compensation targets and, upon information and belief, some of the misrepresentations were necessary to achieve those incentive compensation targets.

● During most of the relevant time period since Wal-Mart has begun to report its alleged "organic growth" within its E-commerce segment, Wal-Mart's stock price had skyrocketed.  From approximately November 2015 through January 2018, Wal-Mart's stock typically rose (without only slight and occasional declines) until it reached a record-high of over $109 dollar per share in late-January 2018.  But then, then on February 20, 2018, Wal-Mart's stock plummeted over ten percent (10%) in a single day in response to its quarterly earnings call's revelation that the company failed to meet its E-

commerce projections.  As one analyst noted, "[t]he most eye-catching development was Walmart's e-commerce sales growth in the United States that slowed to 23% in the fourth quarter, making a sharp decline from 50% in the prior quarter."  Articles immediately filled the world wide web with titles such as "Walmart's online sales growth slips, rattling investors."  And, according to one report, "CEO Doug McMillon struggled on this morning's conference call to provide a succinct reason for the online sales miss."

92.     In October and November 2016, Mr. Huynh continued to report and disclose some of the above concerns to his superiors or those with authority to take remedial action.

**L.     December 2016: Mr. Huynh escalates his disclosures through a formal report to Wal-Mart's Global Ethics Hotline.**

93.     On or about December 20, 2016, Mr. Huynh submitted a formal, detailed disclosure to Wal-Mart's Global Ethics department formally reporting concerns, *inter alia*, that "Marketplace Business and Walmart Labs leadership team members have been manipulating various operating levers to portray an inaccurate picture of the state of Walmart in the long run."

94.     In this formal complaint, and an attached detailed PowerPoint presentation with detailed and specific data presented in it, Mr. Huynh demonstrated how Wal-Mart's Marketplace was still plagued by serious concerns such as, without limitation and merely by way of example:

●  Contrary to its core mantra of "Every Day Low Prices" so its customers can "Save Money, Live Better," Wal-Mart's push to ramp-up SKU numbers allowed a known price-gouging seller to load one million (1,000,000) SKUs onto Wal-Mart's Marketplace platform in FY 2017.  Mr. Huynh had

**COMPLAINT**

previously raised concerns about this price-gouging seller back in November 2014, citing specific examples of this seller listing some products on Wal-Mart's Marketplace at triple the price as the identical item could be purchased at Amazon.com or Toys R' Us.  Yet, as of December 2016, this seller still had excessively priced products on Wal-Mart's site.  Worse, this known price-gouging seller was actually ranked as the second-highest seller in terms of the total number of newly-published SKUs added YTD compared to all other "third-party" sellers on Wal-Mart's Marketplace.  Allowing a known price-gouger to dump a ton of low-quality, high-priced SKUs on Wal-Mart's Marketplace was the fundamental opposite of Wal-Mart's core message: "Every Day Low Prices."

● The push to ramp-up SKU and seller growth had brought about low-quality sellers, such as the offensive "got Hitler?" and "got retard" mugs.  Mr. Huynh presented evidence that this third-tier seller with no established market track record and doing less than one million dollars ($1,000,000) in sales in other Marketplaces was somehow allowed to add one million (1,000,000) SKUs into Wal-Mart's Marketplace making it the fourth-ranked seller in terms of the total number of newly-published SKUs added YTD compared to all other "third-party" sellers on Wal-Mart's Marketplace.

● The failure to fully and finally resolve the issue of incorrect commission charges "could result in both financial and PR Risks."

95.     Mr. Huynh specifically reported in the attached PowerPoint presentation his concerns that "Marketplace Business and Walmart Labs leadership team members manipulated various operating levers to hype up the Marketplace KPIs including:

● "Accelerated the weekly rate of new sellers going live by relaxing the enforcement of prelaunch standards such as lowering the number of required published SKUs, % of published items that are discoverable, % of commission accuracy rate, % of image with acceptable quality, etc."

● "A large percentage of live sellers got stuck with a limited number of published SKUs ... on Walmart.com given the complexity of [Wal-Mart's] Universal Spec/Item ingestion process" but that "[t]o compensate for this limitation, [E-commerce leaders] accelerated the total number of published SKUs on Walmart.com from (6.2 Million SKUs to 30 Million SKUs by ... [a]llowing a small number of sellers (the top 1% of sellers [50] added 50% of the new published SKUs) to stuff our catalog with items that are not [Every Day Low Price] [3X the market price], non-relevant assortment for customers, and High PR risk items such as 'Got Hitler' and 'Got Retard' Mugs."

● "Sellers were not charged and/or overcharged for commission fees on items sold on Walmart.com in the last several months because their published items could not be categorized properly.  This could lead to financial compliance and/or PR risks for Walmart.com."  Most important, Mr. Huynh specifically emphasized the point that "[t]here is no solution in sight to increase accuracy," and that Wal-Mart had been clawing back overpayments from sellers without giving them adequate notice.

96.    Given these and other concerns, Mr. Huynh reported that leadership had misrepresented the true status of Wal-Mart's E-commerce business, and its success and progress, to the investing public.  Mr. Huynh explicitly raised the concern of "[s]hareholder trust/dissatisfaction," noting that "[i]naccurately

communicating the state of the Marketplace Business will set the wrong future expectation for investors which could lead to dissatisfaction and legal/regulatory risks." Mr. Huynh requested that the Global Ethics team "investigate further into this matter and ensure Walmart acts with integrity and ethics toward our shareholders, customers, and seller community" and noted that "taking the appropriate corrective actions in a timely manner will protect our great institution from risks so we can continue to fulfill our mission to Millions of American families (Saving People Money So They Can Live Better)."

97.    Thereafter, Mr. Huynh supplemented his initial report with additional details. However, initially, he received no substantive response other than mere boilerplate acknowledgments of receipt of his report and his additional submissions.

**M.    January 4, 2017: Given Global Ethics' inaction, Mr. Huynh reports his concerns directly to Marc Lore (Wal-Mart U.S. E-commerce's Chief Executive Officer) and Michael Bender (Executive Vice President & Chief Operations Officer).**

98.    Given the apparent failure of the Global Ethics office to take his report seriously, on January 4, 2017 at 8:00 a.m., Mr. Huynh emailed another formal, detailed report (with an even more detailed and expanded version of the PowerPoint presentation attached to his Global Ethics complaint) directly to Wal-Mart U.S.'s E-commerce C.E.O. Marc Lore as well as its Executive Vice President and Chief Operations Officer Michael Bender.

99.    In the body of the email, Mr. Huynh explained that he was reporting "ethics violation/intentional dishonesty at the executive level" that was "already negatively impacting Walmart's brand/reputation with our customers, employees, shareholders, and sellers as well as exposing Walmart to PR, financial, legal, and compliance risks (GAAP and SOX) and will continue to do so unless we take appropriate corrective action soon." Mr. Huynh explained he had already reported

1   issues to the Global Ethics team, but was reaching out to C.E.O Lore and E.V.P.

2   and COO Bender to make them "aware of the deceptive actions ... to manipulate

3   various operating levers (falsely inflating the KPIs) to portray an inaccurate/rosy

4   picture of the state of the MP Business to Walmart's Senior Leaders."

5       100.   In the body of the email, Mr. Huynh further explained that E-

6   commerce leaders "inflated the total # of new sellers launched and the rapid MP

7   assortment expansion on Walmart.com to overstate the MP KPIs," which Mr.

8   Huynh opined was why "the GMV (output) only grew at 118% YOY even though

9   the inputs such as total # of new sellers launched, and the total # of published SKUs

10  grew rapidly at 2,500% and 400% YOY respectively."  In other words, Mr. Huynh

11  illustrated what was obvious to Wal-Mart (yet ignored): the numbers did not make

12  sense.  The extreme disconnect between the year-over-year growth on the input

13  versus output sides reflected the fact that the input numbers were not legitimate.

14  They were manipulated and inflated.

15      101.   Mr. Huynh explained that the lax pre-launch or go-live standards

16  increased the "weekly throughput rate for new sellers launched and the total # of

17  live sellers on the platform (trading quality for quantity), but does not adequately

18  prepare the live sellers to navigate and operate efficiently within the complexities of

19  the Global MP platform (Universal Item spec, item ingestion and categorization)

20  and an insufficient seller support model (the Business Development team spent

21  about 10-15% of our bandwidth to help connect sellers to the right support

22  person)."  Mr. Huynh also explained that Wal-Mart had allowed its Marketplace

23  catalogue to be stuffed "with many published SKUs that are not buyable by

24  customers (non-buyable published SKUs are useless for customers)," and noted the

25  extreme disconnect between this metric on Wal-Mart's own "first-party" system

26  versus its "third-party" Marketplace: "The ratio of total # of buyable SKUs to total

27  # of in-stock SKUs for 1P and Marketplace are 99% and 29% respectively (a 70%

28  delta).

102.   Finally, Mr. Huynh also pointed out in the body of the email serious concerns regarding the overall function and adequacy of Wal-Mart's E-commerce internal controls.  For example, he pointed out that leadership had "covered up the inadequacies/insufficient controls of key systems and business processes like seller payment, commission billing, and customer return chargeback."  Likewise, he noted that "key Marketplace internal systems and processes such as commission fee billing, seller payment, and customer returns charged back to sellers etc. are not robust and scalable enough which resulted in an environment with insufficient controls to support the current 4,702 live sellers let alone [the] plan of having 20,000 live sellers and 100 Mil SKUs on Walmart.com in FY 18 (further exposing Walmart to PR, shareholder, financial, legal, and compliance risk."

103.   In the detailed, forty-two (42) page PowerPoint presentation that accompanied his email to Lore and Bender, Mr. Huynh gave detailed, specific and concrete examples of the above concerns.

104.   Additionally, after he submitted this report to Lore and Bender, Mr. Huynh accessed his Global Ethics complaint on Wal-Mart's online system and submitted additional supplemental materials consisting of the content of his report email to Lore and Bender.

**N.   Within days of his formal report to E-commerce C.E.O. Lore and E.V.P. and C.O.O. Bender, Mr. Huynh is abruptly terminated allegedly as part of a reduction-in-force that had not yet occurred. The very day before his termination, RetaiLeader.com honored Mr. Huynh as one of "17 [Retail] Leaders to Watch in 2017."**

105.   Mr. Huyhn hoped that his report to Lore and Bender would result in his concerns being addressed.  Instead, however, at 4:40 p.m. the very day that Mr. Huynh reported his concerns to Lore and Bender, Mr. Huynh received an out-of-

the-blue email entitled informing him that the Global Ethics "investigation is now complete, and appropriate action has been taken in response to your concerns."

106.   This made little sense.  First, Mr. Huynh had not even been interviewed or spoken with by anyone involved in the purported "investigation." Second, Mr. Huynh had not heard from anyone else in E-commerce that they had been spoken with or interviewed as part of any so-called "investigation."  The "investigation" was apparently a phantom investigation done without speaking to those who logically would have been spoken to had a real investigation been done. Third, of course, given the scope and magnitude of the allegations Mr. Huynh had brought forward, it simply defied credibility to believe that these issues were investigated in any meaningful fashion between his December 20, 2016 complaint and January 4, 2017 – smack in the middle of the year-end Holiday rush that typically produced chaos in retail environment like Wal-Mart.

107.   Thus, the next day, January 5, 2017, Mr. Huynh reached back-out to the Global Ethics office via the online portal and inquired: "Hi, I sent the PDF presentation to ethics@wal-mart.com that I sent to Michael [Bender] and Marc [Lore].  Did you receive the presentation?  Please advise.  Tri."

108.   Mr. Huynh request's was ignored.  Thus, during the day of January 10, 2017, he followed-up again.  Again, this request also was ignored.

109.   But then that same afternoon (January 10, 2017), Wal-Mart delivered Mr. Huynh the final, permanent response to his repeated reports and disclosures: he was terminated abruptly under false pretenses.  In short, Mr. Huynh was told he was being terminated because of the combination of alleged recent performance issues (the November 2016 write-up) and a company reorganization and restructuring. Mr. Huynh was then presented a termination letter dated January 24, 2017 – basically, a form letter for lay-offs that were set to occur on January 24, 2017 as a result of the referenced restructuring.

**COMPLAINT**

1    110.   Mr. Huynh's abrupt termination on January 10, 2017 overshadowed a

2    significant event that occurred the day before.  On January 9, 2017,

3    RetailLeader.com published its list of "17 Leaders to Watch in 2017" nationwide.

4    One Wal-Mart employee made the list: Mr. Huynh.  Indeed, the day before his

5    abrupt termination, the industry honored Mr. Huynh as one of the key industry

6    leaders to watch in the upcoming year.

7    111.   Mr. Huynh's January 4, 2017 report to U.S. E-commerce C.E.O. Lore

8    and E.V.P. and C.O.O. Bender contained additional evidence, support and back-up

9    for his reports that was not contained in his December 20, 2016 submission to

10   Global Ethics.  By rushing to terminate Mr. Huynh within days of his report to Lore

11   and Bender (and without any investigation into the new or expanded reported

12   concerns), Wal-Mart prevented Mr. Huynh from obtaining any additional internal

13   Wal-Mart evidence of its wrongdoing and shut down any investigation into the

14   allegations in the January 4, 2017 before it even began.  This way, upon information

15   and belief, Wal-Mart could avoid having to conduct a real investigation that would

16   have confirmed the validity of Mr. Huynh's concerns.

17   112.   The termination reasons were pretextual.  They were false reasons

18   offered to cover-up the truth: retaliation and discrimination motivated the

19   termination.  Among other things, and not by way of limitation but merely by way

20   of limitation: (a) the issues that led to the November 2016 written warning were

21   bogus – either manufactured or blown out of proportion in order to justify

22   discipline; (b) Mr. Huynh was terminated before the restructuring terminations

23   actually occurred – to his understanding, anyone else terminated as part of the

24   restructuring was not notified until weeks later; (c) there was still an ongoing need

25   for the work Mr. Huynh was performing; duties were not restructured away but

26   remained essential following the restructuring and he was more than qualified to

27   continue to perform; and (d) others at his level in the organizational structure who

28   were not perceived as whistleblowers were treated more favorably than Mr. Huynh

**COMPLAINT**

1    in the restructuring either because they were retained or alternative positions

2    secured for them.

3         113.   Moreover, Wal-Mart did not stop at termination.  Adding more insult

4    to injury, Wal-Mart then used the bogus November 2016 Written Warning to reduce

5    Mr. Huynh's incentive compensation for the prior year's work.

6

7    **O.**     **Mr. Huynh reaches back out to Wal-Mart's Global Ethics after his**

8             **termination.  Nobody helps.  Instead, he learns that the claimed**

9             **"investigation" consisted of the "fox guard the henhouse."**

10            **Apparently, Wal-Mart chose *not* to learn the billion dollar lesson**

11            **from its Mexico bribery scandal.**

12        114.   After he was terminated, Mr. Huynh again reached out to Global Ethics

13   reporting that he has "been terminated ... on January 10, 2017" yet still "[n]o one

14   from the Global Ethics Team has reached out to interview me and my direct reports

15   regarding the case."  Global Ethics ignored this too.

16        115.   Then, Mr. Huynh followed-up again on January 18, 2017 noting that

17   "[i]t has been more than a month since I have opened this case but I have not heard

18   anything back from Global Ethics on the status."

19        116.   Finally, on January 30, 2017, Mr. Huynh heard back from Global

20   Ethics by an entry on Wal-Mart's online portal signed by "Global Ethics" (without

21   identifying a human being responsible for it) stating: "We have reviewed and

22   appropriately handled this matter. ... We partnered with the business to address the

23   concerns."

24        117.   If any investigation was truly done, and if it consisted as stated of Wal-

25   Mart "partnering with the business to address [Mr. Huynh's] concerns," this was

26   totally inappropriate, and Wal-Mart knew better.  The "business" was a key part of

27   the alleged wrongdoer here.  Thus, upon information and belief, the supposedly

28   neutral Global Ethics office "partnering with the business" was an exercise in "the

fox guarding the henhouse."  A core purpose of the Global Ethics department was (supposedly) to provide a neutral, unbiased set of eyes, including specifically to investigate serious allegations against high-ranking executive leadership.  This was precisely such a situation.  By, upon information and belief, involving the wrongdoers in the investigation into themselves, any semblance of neutrality was destroyed.

118.   By December 2016, Wal-Mart cannot claim it did not know better than to let the "fox guard the henhouse" in a situation like Mr. Huynh brought forward. Upon information and belief, choosing to do a biased, skewed "investigation" that allowed the wrongdoers to participate in and/or otherwise control the so-called investigation into themselves was one of the core problems with how Wal-Mart responded when, in 2005, an internal whistleblower reported that Wal-Mart's rapid expansion into Mexico was paved by widespread bribery of Mexican government officials.

119.   Upon information and belief, after Wal-Mart's Mexico bribery scandal broke publicly, one of revelations was that initial efforts to investigate the allegations were swept under the rug by Wal-Mart.  Among other things, it was reported that Wal-Mart retained a reputable international law firm skilled in Foreign Corrupt Practice Act (FCPA) investigations.  This law firm proposed a detailed "investigation plan" for a "thorough investigation" that would take a number of months to complete given the scope of the allegations.  Wal-Mart rejected that proposed comprehensive investigation plan, and instead decided it should merely conduct a "far more limited" internal two-week "Preliminary Inquiry" done by Wal-Mart's internal Corporate Investigations and International Internal Audit Services ('IAS') departments."  By keeping the investigation in-house, and allowing those who were the wrongdoers to be involved in or otherwise control the investigation, Wal-Mart concealed the allegations from the public and investors, and chose not to remedy them – until the news media broke the story.  Nonetheless, even though it

**COMPLAINT**

1   kept the investigation in-house rejecting the outside law firm's recommendation to

2   do a "thorough investigation," Wal-Mart's own inadequate investigation

3   nonetheless concluded that "There is reasonable suspicion to believe that Mexican

4   and USA laws have been violated."  Wal-Mart's choice to conceal the allegations

5   was wrong, and it made the problem worse.

6       120.   Upon information and belief, Wal-Mart did not expand the

7   investigation even after its inadequate internal investigation still found "reasonable

8   suspicion to believe that Mexican and USA laws have been violated.  Instead, Wal-

9   Mart executives dismissed the investigators as "overly aggressive" and control over

10  the investigation was transferred to one of the investigation's initial targets.  It was

11  obviously wrong to transfer the investigation's oversight to the business unit being

12  investigated – let alone, to a particular person alleged to have been part of the

13  problem.  Thus, the General Counsel of Wal-Mart's Mexican operations reported to

14  senior Wal-Mart executives that "[t]he wisdom of assigning any investigative role

15  to management of the business unit being investigated escapes me."  This General

16  Counsel then resigned from Wal-Mart soon after this.  Predictably, Wal-Mart's "fox

17  guarding the henhouse" investigation soon cleared Wal-Mart's Mexican operations

18  of any wrongdoing.

19      121.   Upon information and belief, cleared of any wrongdoing by its biased

20  internal investigation done by partnering with the accused to investigate

21  themselves, Wal-Mart did not disclose the Mexican bribery allegations to investors

22  until 2012 – over six years later – and only after the *New York Times* broke the

23  story.

24      122.   Upon information and belief, Wal-Mart eventually had to acknowledge

25  it did wrong in dealing with the Mexican bribery scandal.  It has been reported that

26  Wal-Mart spent over eight hundred million dollars ($800,000,000) investigating the

27  FCPA allegations and overhauling its entire Global Ethics and Compliance

28  programs as a result.  Wal-Mart has also disclosed in public filings that it has

**COMPLAINT**

1   reserved almost three hundred million dollars ($300,000,000) to resolve the FCPA

2   action brought against it by the Department of Justice and the Securities and

3   Exchange Commission.  Thus, the FCPA scandal was a more than billion dollar

4   lesson.

5        123.   Upon information and belief, one result of this billion dollar lesson

6   was supposedly the complete overhaul of Wal-Mart's Global Ethics and

7   Compliance program.  One of the apparent architects of this complete overhaul of

8   Wal-Mart's compliance program was Jay Jorgensen, now Wal-Mart's Executive

9   Vice President and Global Chief Ethics and Compliance Officer.  Jorgensen was

10   recently quoted as stating that he and Wal-Mart have built "a world-class global

11   ethics and compliance program."  Jorgensen was also recently quoted as

12   acknowledging that "[f]rom the earliest days of the company Walmart has

13   considered even the appearance of impropriety unacceptable...."

14        124.   Upon information and belief, Jorgensen apparently has chosen to

15   ignore the billion dollar lesson, and Wal-Mart has continued to say one thing while

16   doing another.  Its actions continue to speak louder than its words.

17        125.   Specifically, Mr. Huynh's December 20, 2016 formal report to Global

18   Ethics was not just sent to the Global Ethics hotline through an online submission,

19   but Mr. Huynh also separately emailed the report directly to E.V.P. and Global

20   Ethics and Compliance Officer Jorgensen.  Jorgensen obviously knew better than to

21   do what Wal-Mart had done in Mexico: allow the "fox to guard the henhouse" and

22   conduct an investigation that does not even afford adequate time to investigate the

23   nature of what is being alleged.  Yet, upon information and belief, Jorgensen

24   apparently allowed exactly this to happen; he allowed Wal-Mart to repeat history in

25   a very, very bad way.  Upon information and belief, just like happened in Mexico

26   after it learned its employees were bribing the Mexican officials, Wal-Mart

27   responded in the same way to Mr. Huynh's reports to Jorgensen and his Global

28   Ethics department.  First, Global Ethics "partnered with the business" to permit the

"fox to guard the henhouse."  Second, an investigation that should have taken months to complete – if a thorough, fair and honest process was occurring – was wrapped up relatively instantaneously with no evidence of any actual investigation occurring.

126.   Indeed, Mr. Huynh has no reason to believe, and has seen no evidence to suggest, that his concerns were reported to Wal-Mart's Audit Committee in real-time as a result of his disclosures even though under Wal-Mart's policies they clearly should have been.  Without any question, the serious allegations Mr. Huynh raised were required to be reported not only to Wal-Mart's Audit Committee, but also to Wal-Mart's external auditors at Earnst & Young.  However, upon information and belief, this did not occur.

127.   In short, upon information and belief, while Wal-Mart has long told the world that it learned its lesson from its FCPA scandal, this case proves that Wal-Mart's actions speak louder than its words.  Over a decade later, it resorted to the same improper tactics to silence and cover-up serious allegations of corporate wrongdoing that reach the highest-levels of the corporation.  And, to this day, Wal-Mart's senior leaders and outside auditors continue to certify that Wal-Mart's internal controls are adequate and contain no material weaknesses, contrary to all of the evidence disclosed by Mr. Huynh and others.

128.   Finally, and upon information and belief, both this latest chapter and Wal-Mart's Mexican bribery scandal share another feature in common: the same underlying core motive.  In both cases, instead of competing with ethics, honesty, integrity and merit like Sam Walton taught, Wal-Mart cut corners and cheated in a race to expand and gain market-share.  It cheated in Mexico by bribing public officials to expedite its rapid expansion.  It is cheating today in the race with Amazon by lying to the investing public about its real progress in E-commerce.

**FIRST CLAIM FOR RELIEF FOR**

**WHISTLEBLOWER RETALIATION IN VIOLATION**

**OF THE SARBANES-OXLEY ACT OF 2002**

**( 18 U.S.C. § 1514A, et seq.)**

129.   Plaintiff repeats and realleges each and every allegation contained in all paragraphs before and after this paragraph as though set forth in full in this Claim for Relief.

130.   Plaintiff was an employee, and Defendants are employers, within the meaning of the Sarbanes-Oxley Act of 2002, Public Law 107-204, 18 U.S.C. section 1514A, et seq.

131.   Plaintiff engaged in activity that is legally-protected under the Sarbanes-Oxley Act by, *inter alia*, and not by way of limitation but merely by way of example, reporting or disclosing to his supervisors or individuals with authority to investigate/remedy the following concerns which he reasonably and in good faith believed violated the law as detailed above including, without limitation and merely by way of example:

● Securities fraud, violations of the rules and regulations of the SEC and/or any provision of law relating to fraud against shareholders with respect to the misrepresentations detailed herein relating to E-commerce growth and status;

● Mail and/or wire fraud relating to commission overcharging, including the continued overcharging after Wal-Mart was clearly aware of the problem. Relatedly, securities fraud, violations of the rules and regulations of the SEC and/or any provision of law relating to fraud against shareholders with respect to the commission overcharging issue given the fact that Wal-Mart retained the excess commissions and reported them on their public financials;

**COMPLAINT**

● Mail and/or wire fraud in failing to process customer returns on a timely basis yet retaining the funds collected from the underlying purchases. Relatedly, securities fraud, violations of the rules and regulations of the SEC and/or any provision of law relating to fraud against shareholders with respect to the customer returns issue given the fact that Wal-Mart retained the funds that should have been returned to customers and reported them on their public financials; and

● Violations of internal controls, failure to have a sufficient system of internal controls, and/or the failure to correct and remedy known inadequacies in key controls.  Specifically, as detailed herein, Mr. Huynh's reports and disclosures included reports of Wal-Mart's failure to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that – (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization...."  15 U.S.C. §78m(b)(2)(B); *see also* 17 C.F.R. §240.13a-15(f).  Moreover, Mr. Huynh disclosed instances of and/or attempts to "knowingly circumvent or knowingly fail to implement a system of internal accounting controls ...."  15 U.S.C. §78m(b)(3)(5).  Finally, these disclosures were also reasonably believed to be disclosures that Wal-Mart's senior corporate executives and outside auditors had been improperly certifying the effectiveness of Wal-Mart's key controls as required as part of regular financial reporting, despite the lack of a proper factual basis to make such certifications.  *See e.g.*, 15 U.S.C. §§7241 & 7262.

132.   Plaintiff's protected activities as detailed herein were a contributing factor to Defendants' decision to take adverse actions including: (1) the pattern of ostracism, exclusion, etc.; (2) the November 2016 write-up; and (3) the termination.

133.   As a proximate result of the foregoing retaliatory actions, Mr. Huynh has been damaged (economically and otherwise) and seeks all appropriate relief available under the whistleblower retaliation provisions of the Sarbanes-Oxley Act of 2002, including but not limited to full compensatory relief and all other necessary make-whole relief in an amount according to proof.

134.   Moreover, Plaintiff has been forced to and has incurred attorney's fees and costs to prosecute this action, which Plaintiff seeks to recover on this claim.

## SECOND CLAIM FOR RELIEF FOR
## WHISTLEBLOWER RETALIATION IN VIOLATION
## OF THE CALIFORNIA LABOR CODE
### (Cal. Labor Code § 1102.5.)

135.   Plaintiff repeats and realleges each and every allegation contained in all paragraphs before and after this paragraph as though set forth in full in this Claim for Relief.

136.   During his employment, Plaintiff engaged in activities protected under California Labor Code section 1102.5 as set forth herein.  For example, without limitation and merely by way of example, among other things, Plaintiff engaged in activity that is legally-protected under the Sarbanes-Oxley Act by, *inter alia*, and not by way of limitation but merely by way of example, reporting or disclosing to his supervisors or individuals with authority to investigate/remedy the following concerns which he reasonably and in good faith believed violated the law as detailed above including, without limitation and merely by way of example:

**COMPLAINT**

1

2

3

4

● Securities fraud, violations of the rules and regulations of the SEC and/or any provision of law relating to fraud against shareholders with respect to the misrepresentations detailed herein relating to E-commerce growth and status;

5

6

7

8

9

10

11

● Mail and/or wire fraud relating to commission overcharging, including the continued overcharging after Wal-Mart was clearly aware of the problem. Relatedly, securities fraud, violations of the rules and regulations of the SEC and/or any provision of law relating to fraud against shareholders with respect to the commission overcharging issue given the fact that Wal-Mart retained the excess commissions and reported them on their public financials;

12

13

14

15

16

17

18

19

● Mail and/or wire fraud in failing to process customer returns on a timely basis yet retaining the funds collected from the underlying purchases. Relatedly, securities fraud, violations of the rules and regulations of the SEC and/or any provision of law relating to fraud against shareholders with respect to the customer returns issue given the fact that Wal-Mart retained the funds that should have been returned to customers and reported them on their public financials[5]; and

20

21

22

23

24

25

26

● Violations of internal controls, failure to have a sufficient system of internal controls, and/or the failure to correct and remedy known inadequacies in key controls.  Specifically, as detailed herein, Mr. Huynh's reports and disclosures included reports of Wal-Mart's failure to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that – (i) transactions are executed in accordance with

27

28

[5]  These same reports or disclosures were also disclosures of information Mr. Huynh reasonably and in good faith believed violated state laws regarding unlawful business practices, fraudulent or dishonest sales practices and other similar laws.

**COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14

management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization...." 15 U.S.C. §78m(b)(2)(B); *see also* 17 C.F.R. §240.13a-15(f).  Moreover, Mr. Huynh disclosed instances of and/or attempts to "knowingly circumvent or knowingly fail to implement a system of internal accounting controls ...." 15 U.S.C. §78m(b)(3)(5).  Finally, these disclosures were also reasonably believed to be disclosures that Wal-Mart's senior corporate executives and outside auditors had been improperly certifying the effectiveness of Wal-Mart's key controls as required as part of regular financial reporting, despite the lack of a proper factual basis to make such certifications. *See e.g.*, 15 U.S.C. §§7241 & 7262.

15

16
17
18
19
20
21
22
23
24

137.   Plaintiff's conduct constituted a disclosure of and/or opposition to conduct that Plaintiff had reasonable cause to believe disclosed a violation of state, local and/or federal laws, rules, or regulations.  Plaintiff made such disclosures to person(s) with authority over Plaintiff or other employee(s) who had the authority to investigate, discover, or correct the violation or non-compliance.  Plaintiff also refused to engage in activity that was illegal.  Defendants also perceived, feared and/or believed that Plaintiff may make protected disclosures in the future. Plaintiff's conduct was thus protected under section California Labor Code section 1102.5.

25
26
27

138.   Defendants took adverse action against Plaintiff as detailed herein (including the pattern of systematic retaliation, the November 2016 write-up and the termination of Plaintiff's employment), and Plaintiff's protected activities, refusals

28

**COMPLAINT**

1  and/or opposition was/were a contributing factor to Defendants' decision to take

2  those adverse actions against Plaintiff.

3      139.   As a direct and foreseeable result of the aforesaid acts of said

4  Defendants, Plaintiff has suffered and will suffer harm for which Plaintiff is entitled

5  to general and special damages and all appropriate compensatory relief.

6  Defendants' conduct was a substantial factor in causing that harm.

7      140.   The above described acts of Defendants, including by and through

8  their managing agents, officers, or directors, were engaged in with a deliberate,

9  cold, callous, fraudulent, and intentional manner in order to injure and damage

10  Plaintiff and/or with a conscious disregard of Plaintiff's rights.  Such acts were

11  despicable and constitute malice, fraud, and/or oppression within the meaning of

12  Civil Code section 3294.  Plaintiff requests an assessment of punitive damages

13  against Defendants in an amount to be assessed at time of trial.

14

15  **THIRD CLAIM FOR RELIEF FOR**

16  **DISABILITY DISCRIMINATION IN**

17  **VIOLATION OF CALIFORNIA FAIR**

18  **EMPLOYMENT AND HOUSING ACT**

19  **(Cal. Gov. Code §12940(a))**

20      141.   Plaintiff repeats and realleges each and every allegation contained in

21  all paragraphs before and after this paragraph as though set forth in full in this

22  Claim for Relief.

23      142.   Defendants are entities and/or employers governed by the Fair

24  Employment and Housing Act (FEHA), Government Code section 12900 et seq.,

25  including section 12940.

26      143.   At all relevant times, Plaintiff had one or more mental and/or physical

27  disabilities; had a history of one or more disabilities; had a record of one or more

28  disabilities; and/or was perceived or regarded as having one or more disabilities that

constituted protected characteristics under the FEHA including but not limited to because of either present or future disabling effects.

144.   Despite his disabilities, Plaintiff was able to perform the essential functions of his job with or without reasonable accommodations.

145.   Defendants, and each of them, knew of Plaintiff's disabilities and knew or should have known that Plaintiff's disabilities fell within the definition of a disability under Government Code section 12926.  Defendants further knew or should have known that despite his disability, Plaintiff could perform the essential functions of her job with or without reasonable accommodations.

146.   Despite their knowledge of the foregoing, Defendants took adverse action against Plaintiff, including, but not limited to the pattern of mistreatment, the November 2016 write-up and terminating Plaintiff's employment.  Plaintiff's disabilities were a substantial motivating reason for Defendants' conduct.

147.   In engaging in the foregoing conduct, Defendants aided, abetted, incited, participated in, coerced, and/or compelled unlawful employment practices in violation of the FEHA and the announced policy of this State against such practices.

148.   As a direct and foreseeable result of the aforesaid acts of said Defendants, Plaintiff has suffered and will suffer harm for which he is entitled to general and special damages.   Defendants' conduct was a substantial factor in causing that harm.

149.   The above described acts of Defendants, including by and through their managing agents, officers, or directors, were engaged in with a deliberate, cold, callous, fraudulent, and intentional manner in order to injure and damage Plaintiff and/or with a conscious disregard of Plaintiff's rights.  Such acts were despicable and constitute malice, fraud, and/or oppression within the meaning of Civil Code section 3294.  Plaintiff requests an assessment of punitive damages against Defendants in an amount to be assessed at time of trial.

**COMPLAINT**

150.   Plaintiff will also seek and is entitled to recover attorney's fees in connection with this cause of action under the FEHA.

151.   Plaintiff specifically seeks declaratory and/or injunctive relief on this claim to the extent that Defendants' assert a mixed-motive affirmative defense.

## FOURTH CLAIM FOR RELIEF FOR
## FAILURE TO ACCOMMODATE IN VIOLATION OF
## CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT
### (Cal. Gov. Code §12940(m))

152.   Plaintiff repeats and realleges each and every allegation contained in all paragraphs before and after this paragraph as though set forth in full in this Claim for Relief.

153.   Defendants are entities and/or employers governed by the Fair Employment and Housing Act, Government Code section 12900 et seq., including section 12940.

154.   At all relevant times, Plaintiff had one or more mental and/or physical disabilities; had a history of one or more disabilities; had a record of one or more disabilities; and/or was perceived or regarded as having one or more disabilities that constituted protected characteristics under the FEHA including but not limited to because of either present or future disabling effects.

155.   Despite his disabilities, Plaintiff was able to perform the essential functions of his job with or without reasonable accommodations.

156.   Defendants, and each of them, knew of Plaintiff's disabilities and knew or should have known that Plaintiff's disabilities fell within the definition of a disability under Government Code section 12926.  Defendants further knew or should have known that despite his disability, Plaintiff could perform the essential functions of her job with or without reasonable accommodations.

**COMPLAINT**

157.   Despite their knowledge of the foregoing, Defendants failed to accommodate Plaintiff's disabilities.

158.   In engaging in the foregoing conduct, Defendants aided, abetted, incited, participated in, coerced, and/or compelled unlawful employment practices in violation of the FEHA and the announced policy of this State against such practices.

159.   As a direct and foreseeable result of the aforesaid acts of said Defendants, Plaintiff has suffered and will suffer harm for which he is entitled to general and special damages.   Defendants' conduct was a substantial factor in causing that harm.

160.   The above described acts of Defendants, including by and through their managing agents, officers, or directors, were engaged in with a deliberate, cold, callous, fraudulent, and intentional manner in order to injure and damage Plaintiff and/or with a conscious disregard of Plaintiff's rights.  Such acts were despicable and constitute malice, fraud, and/or oppression within the meaning of Civil Code section 3294.  Plaintiff requests an assessment of punitive damages against Defendants in an amount to be assessed at time of trial.

161.   Plaintiff will also seek and is entitled to recover attorney's fees in connection with this cause of action under the FEHA.

**FIFTH CLAIM FOR RELIEF FOR**
**FAILURE TO ENGAGE IN TIMELY, GOOD FAITH**
**INTERACTIVE PROCESS IN VIOLATION OF CALIFORNIA**
**FAIR EMPLOYMENT AND HOUSING ACT**
**(Cal. Gov. Code §12940(n))**

162.   Plaintiff repeats and realleges each and every allegation contained in all paragraphs before and after this paragraph as though set forth in full in this Claim for Relief.

1    163.   Defendants are entities and/or employers governed by the Fair

2    Employment and Housing Act, Government Code section 12900 et seq., including

3    section 12940.

4    164.   At all relevant times, Plaintiff had one or more mental and/or physical

5    disabilities; had a history of one or more disabilities; had a record of one or more

6    disabilities; and/or was perceived or regarded as having one or more disabilities that

7    constituted protected characteristics under the FEHA including but not limited to

8    because of either present or future disabling effects.

9    165.   Despite his disabilities, Plaintiff was able to perform the essential

10   functions of his job with or without reasonable accommodations.

11   166.   Defendants also knew, or should have known, of the need to

12   accommodate Plaintiff's disabilities, including the need to engage in the interactive

13   process to determine how to achieve a reasonable accommodation for Plaintiff.

14   However, Defendants failed and refused to engage in the interactive process with

15   Plaintiff despite notice of his disability and a need to consider accommodations.

16   167.   Instead of engaging in the interactive process, Defendants took adverse

17   action against Plaintiff and failed to reasonably accommodate his disabilities.

18   168.   In engaging in the foregoing conduct, Defendants aided, abetted,

19   incited, participated in, coerced and/or compelled unlawful employment practices in

20   violation of the FEHA and the announced policy of this State against such

21   practices.

22   169.   As a direct and foreseeable result of the aforesaid acts of said

23   Defendants, Plaintiff has suffered and will suffer harm for which he is entitled to

24   general and special damages.   Defendants' conduct was a substantial factor in

25   causing that harm.

26   170.   The above described acts of Defendants, including by and through

27   their managing agents, officers, or directors, were engaged in with a deliberate,

28   cold, callous, fraudulent, and intentional manner in order to injure and damage

Plaintiff and/or with a conscious disregard of Plaintiff's rights.  Such acts were despicable and constitute malice, fraud, and/or oppression within the meaning of Civil Code section 3294.  Plaintiff requests an assessment of punitive damages against Defendants in an amount to be assessed at time of trial.

171.   Plaintiff will also seek and is entitled to recover attorney's fees in connection with this cause of action under the FEHA.

**SIXTH CLAIM FOR RELIEF FOR**

**RETALIATION IN VIOLATION OF CALIFORNIA**

**FAIR EMPLOYMENT AND HOUSING ACT**

**(Cal. Gov. Code §12940(h))**

172.   Plaintiff repeats and realleges each and every allegation contained in all paragraphs before and after this paragraph as though set forth in full in this Claim for Relief.

173.   Defendants are entities and/or employers governed by the Fair Employment and Housing Act, Government Code section 12900 et seq., including section 12940.

174.   During his employment by Defendants, Plaintiff opposed and objected to what he reasonably believed were unlawful discriminatory and retaliatory practices.  Plaintiff also disclosed a disability and effectively sought accommodations of his disabilities under the California Fair Employment & Housing Act to the extent necessary.

175.   After Plaintiff engaged in protected activities, he was subjected to adverse employment actions as described herein.

176.   The foregoing described adverse employment actions were substantially motivated by Plaintiff's protected activities described above.

177.   In engaging in the aforementioned conduct, Defendants, and each of them, aided, abetted, incited, compelled, and/or coerced unlawful employment

1  practices in violation of the FEHA and the announced policy of this State against
2  such practices.

3          178.   As a direct and foreseeable result of the aforesaid acts of said
4  Defendants, Plaintiff has suffered and will suffer harm for which he is entitled to
5  general and special damages.  Defendants' conduct was a substantial factor in
6  causing that harm.

7          179.   The above described acts of Defendants, including by and through
8  their managing agents, officers, or directors, were engaged in with a deliberate,
9  cold, callous, fraudulent, and intentional manner in order to injure and damage
10  Plaintiff and/or with a conscious disregard of Plaintiff's rights.  Such acts were
11  despicable and constitute malice, fraud, and/or oppression within the meaning of
12  Civil Code section 3294.  Plaintiff requests an assessment of punitive damages
13  against Defendants in an amount to be assessed at time of trial.

14          180.   Plaintiff will also seek and is entitled to recover attorney's fees in
15  connection with this cause of action under the FEHA.

16          181.   Plaintiff specifically seeks declaratory and/or injunctive relief on this
17  claim to the extent that Defendants' assert a mixed-motive affirmative defense.

18

19                    **SEVENTH CLAIM FOR RELIEF FOR**
20                **FAILURE TO PREVENT DISCRIMINATION**
21          **AND RETALIATION IN VIOLATION OF CALIFORNIA**
22               **FAIR EMPLOYMENT AND HOUSING ACT**
23                       **(Cal. Gov. Code §12940(k))**

24          181.   Plaintiff repeats and realleges each and every allegation contained in
25  all paragraphs before and after this paragraph as though set forth in full in this
26  Claim for Relief.

27          182.   Defendants, and/or their agents/employees, failed to take all reasonable
28  steps necessary to prevent discrimination and retaliation in employment from

occurring.  Further, said Defendants knew or should have known of the discrimination and retaliation against Plaintiff described above, yet failed to conduct an adequate investigation into the nature and substance of the discrimination and retaliation and failed to take immediate and appropriate corrective action so as to discipline any of the offenders.

183.   The response of Defendants, and/or their agents/employees, to that knowledge was so inadequate as to establish a deliberate indifference to, or tacit authorization of, the offensive practices, and an affirmative causal link existed between Defendants' inaction and the injuries suffered by Plaintiff.

184.   By failing to take all reasonable steps necessary to prevent discrimination and retaliation, and by failing to properly investigate and remedy the discrimination and retaliation that occurred, Defendants committed unlawful employment practices as described and prohibited in Government Code section 12940(k).

185.   In engaging in the aforementioned conduct, Defendants, and each of them, aided, abetted, incited, compelled, and/or coerced unlawful employment practices in violation of the FEHA and the announced policy of this State against such practices.

186.   As a direct and foreseeable result of the aforesaid acts of said Defendants, Plaintiff has suffered and will suffer harm for which he is entitled to general and special damages.   Defendants' conduct was a substantial factor in causing that harm.

187.   The above described acts of Defendants, including by and through their managing agents, officers, or directors, were engaged in with a deliberate, cold, callous, fraudulent, and intentional manner in order to injure and damage Plaintiff and/or with a conscious disregard of Plaintiff's rights.  Such acts were despicable and constitute malice, fraud, and/or oppression within the meaning of

**COMPLAINT**

Civil Code section 3294.  Plaintiff requests an assessment of punitive damages against Defendants in an amount to be assessed at time of trial.

188.   Plaintiff will also seek and is entitled to recover attorney's fees in connection with this cause of action under the FEHA.

## EIGHTH CLAIM FOR RELIEF FOR
## WRONGFUL TERMINATION VIOLATION
## OF PUBLIC POLICY

189.   Plaintiff repeats and realleges each and every allegation contained in all paragraphs before and after this paragraph as though set forth in full in this Claim for Relief.

190.   Defendants terminated Plaintiff's employment in violation of fundamental public policies of the State of California and the United States of America including, without limitation and merely by way of illustration: the right to engage in protected activity under the Sarbanes-Oxley Act of 2002; the right to protections against discrimination in employment because of a disability; the right to accommodations of a disability (including a good faith interactive process); the right to freedom from retaliation for engaging in protected activity under the Fair Employment and Housing Act; the right to report or disclose suspected unlawful activity; (including the California Family Rights Act, which is part of the FEHA); the right to freedom from retaliation for opposing, complaining, disclosing, protesting, or refusing to participate in an activity constituting (or that the employee reasonably believes constitutes) a violation of a state or federal statute, rule, or regulation (including but not limited to, and offered as illustrations and not by way of example, securities laws, securities fraud laws, mail and/or wire fraud laws, consumer fraud laws, common law fraud laws, unfair and fraudulent business practice laws, etc.).

**COMPLAINT**

191. These fundamental public policies inure to the benefit of the public and not just the private interests of the employer and employee.

192. As set forth above, Defendants' conduct was wrongful and in violation of the fundamental principles of the public policy of the State of California as reflected in its laws, objectives, and policies. Said laws, which establish these fundamental public policies include, without limitation and merely by way of example: the Sarbanes-Oxley Act of 2002 and related laws and Regulations, including but not limited to laws relating to internal accounting controls, securities fraud laws, laws relating to fraud on shareholders and laws relating to mail and wire fraud; common law fraud laws; statutory fraudulent business practice laws; California Labor Code section 1102.5; the FEHA – Government Code section 12900, et seq.

193. As a direct and foreseeable result of the aforesaid acts of said Defendants, Plaintiff has suffered and will suffer harm for which he is entitled to general and special damages. Defendants' conduct was a substantial factor in causing that harm.

194. The above described acts of Defendants, including by and through their managing agents, officers, or directors, were engaged in with a deliberate, cold, callous, fraudulent, and intentional manner in order to injure and damage Plaintiff and/or with a conscious disregard of Plaintiff's rights. Such acts were despicable and constitute malice, fraud, and/or oppression within the meaning of Civil Code section 3294. Plaintiff requests an assessment of punitive damages against Defendants in an amount to be assessed at time of trial.

## PRAYER

WHEREFORE, plaintiff prays for relief as set forth above and as follows:

1. Damages for lost wages and any other economic losses, including but not limited to back and front pay;

**COMPLAINT**

2.      Damages for emotional distress and other general damages;

3.      Special damages according to proof at trial;

4.      Pre-judgment interest;

5.      Reasonable costs, including reasonable attorney's fees and expert witness fees, as permitted by the relevant statutes;

6.      For punitive damages according to proof; and

7.      For injunctive and/or declaratory relief;

8.      For such other and further relief as the court deems just and proper.

Dated: March 15, 2018              **The deRubertis Law Firm, APC**

                                          / s / David M. deRubertis
                              By_____
                                          David M. deRubertis
                                          Attorneys for Plaintiff
                                          Tri Huynh

**COMPLAINT**

1

**DEMAND FOR JURY TRIAL**

2      Plaintiff hereby demands a trial by jury on all issues so triable in this

3 complaint or any subsequent amended complaint or any other pleading filed in this

4 action.

5 Dated: March 15, 2018          **The deRubertis Law Firm, APC**

6                                     / s / David M. deRubertis
                                   By_____
7                                     David M. deRubertis
                                   Attorneys for Plaintiff
8                                   Tri Huynh

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**