TRI HUYNH
4015 134th Avenue. S.E.
Bellevue, WA 98006
trimhuynh@outlook.com

Plaintiff, proceeding *pro se*

GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR., SBN 132099
   tboutrous@gibsondunn.com
RACHEL S. BRASS, SBN 219301
   rbrass@gibsondunn.com
Gibson, Dunn & Crutcher LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

EUGENE SCALIA, SBN 151540
   escalia@gibsondunn.com
RYAN STEWART (*pro hac vice*)
   rstewart@gibsondunn.com
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  202.955.8500
Facsimile:  202.530.9606

*Attorneys for Defendants*,
   WALMART INC.
   WAL-MART ASSOCIATES, INC.
   WAL-MART.COM USA, LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TRI HUYNH,<br><br>        Plaintiff,<br><br>  v.<br><br>WAL-MART STORES, INC., a Delaware Corporation; WAL-MART ASSOCIATES, INC., a Delaware Corporation; WAL-MART.COM, INC., a Delaware Corporation; and DOES 1 through 50, inclusive.<br><br>        Defendants. | Case No. 3:18-cv-01631-VC<br><br>**JOINT DISCOVERY LETTER REGARDING PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANTS' SECOND REQUESTS FOR PRODUCTION**<br><br>District Judge:  Hon. Vince Chhabria<br>Magistrate Judge:  Hon. Sallie Kim |

Pursuant to the Standing Order for Magistrate Judge Sallie Kim, this joint discovery letter addresses the Parties' disputes related to Plaintiff's Responses and Objections to Defendants Walmart Inc. (formerly known as "Wal-Mart Stores, Inc."), Wal-Mart Associates, Inc., and Wal-Mart.com USA LLC's (collectively, "Defendants" or "Walmart") Second Requests for Production. The Parties met and conferred telephonically on May 14, 2019. Following the May 14, 2019 call, Plaintiff requested additional time to consider his position; on May 17, 2019, Plaintiff informed Defendants that he was standing on his written objections and would not produce responsive documents. Accordingly, the parties were unable to resolve this dispute. By signing below, the Parties attest that they have complied with Section 9 of the Northern District's Guidelines for Professional Conduct regarding discovery prior to filing this joint letter.

DATED: May 24, 2019

**Tri Huynh**

By: /s/ Tri Huynh
Tri Huynh
Plaintiff, proceeding *pro se*

**Gibson, Dunn & Crutcher LLP**

By: /s/ Rachel S. Brass
Rachel S. Brass
Attorneys for Defendants Walmart, Inc.,
Wal-Mart Associates, Inc., and
Wal-Mart.com USA, LLC

## ATTORNEY ATTESTATION

I, Rachel S. Brass, am the ECF User whose ID and password are being used to file this **JOINT DISCOVERY LETTER REGARDING PLAINTIFF'S RESPONSES TO DEFENDANTS' SECOND REQUESTS FOR PRODUCTION**. In compliance with N.D. Cal. L.R. 5-1(i)(3), I hereby attest that the concurrence in the filing of the document has been obtained from the other signatory.

By: /s/ Rachel S. Brass
Rachel S. Brass

## I. NATURE OF THE DISPUTE

Plaintiff Tri Huynh ("Plaintiff") alleges that he was subjected to disability discrimination, whistleblower retaliation, and wrongful termination and suffered various damages, including emotional harm, because of Defendants' alleged conduct. Dkt. 8, First Amended Complaint ("FAC"). At issue here is Plaintiff's refusal to produce any documents responsive to Defendants' Second Requests for Production (the "Requests") (Ex. A.). The Requests seek documents related to Plaintiff's prior employment, namely Plaintiff's allegations of illegal or unethical conduct by prior employers, his prior complaints of employment-based retaliation, prior whistleblower-type claims, and termination of employment with Amazon, which employed Plaintiff before Walmart hired him. Plaintiff stated in his Responses and Objections to the Requests (Ex. B.) that the discovery sought was irrelevant, and asserted on the May 14, 2019 meet and confer call that he owed a duty of confidentiality to Amazon that prevents him from producing documents related to his employment there.

Walmart deposed Plaintiff on May 20, 2019. A Settlement Conference with Magistrate Judge Laurel Beeler is set for June 12, 2019. Fact discovery closes on July 19, 2019. The final pretrial conference is set for January 27, 2020, and trial is scheduled for February 10, 2020. *See* Dkt. 51.

## II. DEFENDANTS' POSITION

The allegations Plaintiff makes in this case are serious. During the course of discovery, Defendants have uncovered evidence that he previously made strikingly similar allegations against his immediately prior employer, Amazon.com. That revelation—the basis of the Requests—makes the discovery sought unquestionably relevant; there is no legitimate basis for Plaintiff's refusal to produce responsive documents. Instead, his apparent pattern of responding to workplace discipline or potential termination by going on the offensive and accusing his employers of wrongdoing goes directly to Plaintiff's credibility as a witness. It is no wonder then, that Plaintiff resists all discovery into these matters.[1]

Defendants first learned about the circumstances surrounding Amazon.com's termination of Plaintiff's employment through medical records produced by his treating physician, Dr. Mary Ann

---

[1] Defendants do not directly respond to the spate of incorrect and factually baseless assertions with which Plaintiff fills his response here other than to note that the fact he has responded to a legitimate discovery dispute by hurling accusations is consistent with his course of conduct at Walmart, and it appears Amazon.com as well (where he responded to negative feedback by going on the offensive), as well as in this litigation, where he repeatedly responds to any discovery issue with a tit for tat response.

- 1 -

**JOINT DISCOVERY LETTER**                                   **CASE NO. 3:18-CV-01631-VC**

Bolte. When Dr. Bolte first produced those records, statements regarding Amazon.com were redacted. During extensive written and telephonic meet and confers, Plaintiff steadfastly refused to produce those records in non-redacted form. Only after requiring Walmart to prepare and send its half of a joint letter brief pursuant to the Court's standing order did Plaintiff relent and agree to produce the documents. When those records were produced, it was clear why Plaintiff had resisted their production: those documents make clear that shortly after receiving a negative performance review at Amazon.com, Plaintiff wrote to Jeff Bezos alleging he was being punished for blowing the whistle on purported misconduct.

In light of that information, and in order to have this discovery for Plaintiff's deposition, Defendants served tailored Second Requests for Production seeking all documents related to 1) Plaintiff's allegations of employment-related retaliation against any other person, 2) documents related to alleged Sarbanes-Oxley violations, antitrust violations, securities law violations, or violations of any other law by Plaintiff's former employers, 3) allegations of employment-related ethical violations Plaintiff made against any other person, and 4) documents related to his termination by Amazon.com. On May 13, 2019, Plaintiff responded, refusing to produce any documents whatsoever on relevance grounds.

With Plaintiff's deposition imminent, Defendants sent a letter citing cases from the Northern District of California requiring production of similar documents under similar circumstances. In that letter, Defendants explained that there was no legal basis for Plaintiff's position, and that Defendants would seek not only production of the documents, but additional deposition-related relief if Plaintiff stood on his objections. Plaintiff responded with an email stating that the fact that Defendants had objected to certain of his unrelated discovery requests on the basis of relevance was the basis for his objection. On May 15, the parties met and conferred by telephone. During that call, Plaintiff explained that the discovery sought was irrelevant and protected by disclosure because it contained Amazon.com's competitively sensitive information. Defendants explained, as they had when Plaintiff made the same argument as to Dr. Bolte's records, that any potential confidentiality concerns could be addressed by the Protective Order entered in this matter, including by an Attorneys' Eyes Only designation. To that end, Defendants directed Plaintiff to April 4, 2019 correspondence responding to those same arguments. Defendants also explained that the fact they had objected to certain of Plaintiff's discovery requests was not a proper basis for his refusal to produce responsive documents, but agreed

to separately address whatever concerns Plaintiff had regarding that discovery. After further considering the issue, on May 17, 2019, Plaintiff confirmed his refusal to produce responsive documents.

**ARGUMENT**

Documents responsive to the Requests at issue here go directly to the heart of the claims Plaintiff is pursuing here, including his credibility, a potential after-acquired evidence defense, and his damages claims. Plaintiff has no plausible justification for refusing to produce them; as a result, Defendants' motion to compel should be granted.

*First*, documents related to Plaintiff's prior employment—including allegations of wrongdoing made against his prior employers—are probative of the veracity of the merits of Plaintiff's claims here. In *Frazier v. Bed, Bath & Beyond, Inc.*, which concerned requests for prior employment records nearly identical to those at issue here, the Court found such documents relevant under Federal Rule of Evidence 404(b) and 406 and ordered production. Dkt. 10, 2011 WL 5854601, at *2 (N.D. Cal. Nov. 21, 2011). That is because such documents bore directly on whether the plaintiff had a history of alleging mistreatment by his employers and the credibility of claims against his current employer. *Id*. at *1. Similarly, in *Dornell v. City of San Mateo*, the Court held that personnel records from a plaintiff's prior employers were relevant to claims of employment discrimination and adverse treatment by a current employer; specifically, the records were probative of whether the plaintiff had a pattern of complaining about discrimination. Dkt. 30, 2013 WL 5443036, at *5 (N.D. Cal. Sept. 30, 2013). Here, unredacted portions of a visit to Plaintiff's psychiatrist in August 2013, when he was employed by Amazon.com, indicate that Plaintiff was "quite upset" because he has "worked very hard for Amazon bringing in a lot of money and helping out the company, but when he raised an ethical dilemma at work he has been retaliated against." Dr. Bolte's records of November 6, 2013 visit also reference a draft letter written by Plaintiff to Jeff Bezos detailing his allegations. Defendants should be permitted to probe the broader context of the statement, as well as related statements elsewhere in the discovery record.

*Second*, the documents sought are relevant to an "after-acquired" evidence defense, which provides that a defendant may avoid certain categories of damages, such as back pay, by showing that the plaintiff engaged in misconduct that would have subjected him to termination had the defendant known of it during the plaintiff's employment. *See Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1071 (9th Cir.

2004). Courts in this Circuit have held that "[f]ormer employment records are relevant to the after-acquired evidence defense available in Title VII employment discrimination cases." *See, e.g.*, *First v. Kia of El Cajon*, 2010 WL 3245778, at *1 (S.D. Cal. Aug. 17, 2010). Defendants are entitled to probe the full circumstances of Plaintiff's termination by Amazon.com with respect to this defense.

*Third*, the documents sought go to Plaintiff's claimed emotional distress, punitive damages, and damages from lost wages, in that they help establish whether he suffered any emotional distress from his termination, *see, e.g., Dornell*, 2013 WL 5443036, at *4, as well as helping estimate any lost past or future income. *See Romero v. Cal. Highway Patrol*, 2007 WL 518987, at *1 (N.D. Cal. 2007) (employment records relevant to lost income). Other statements in Plaintiff's medical records stating that he is "distrustful of all corporations," further reinforce Defendants' arguments about relevance.

In response, Plaintiff makes certain arguments, none of which is correct. He purports to be concerned that his documents contain Amazon.com's commercially sensitive information. But any such concerns are capable of redress through the Protective Order entered by Judge Chhabria in this matter by producing the documents as "Confidential or "Attorneys' Eyes Only." Plaintiff's dissatisfaction with Defendants' responses to his discovery is also not a basis upon which to refuse to produce relevant discovery. *See, e.g., Lindell v. Synthes USA et al.*, No. 1:11-CV-02053, 2013 WL 3146806, at *4 (E.D. Cal. June 18, 2013).[2]

There is no proper basis for Plaintiff's refusal to produce responsive documents. Defendants respectfully request an order compelling production of all documents responsive to Defendants' Requests no later than June 1, 2019, requiring Plaintiff to appear for a further deposition regarding those documents, in San Francisco, in advance of the June 12 Settlement Conference, and allowing Defendants an additional hour of deposition time to address documents responsive to the Requests.

**Plaintiff's Position:**

---

[2] When Mr. Huynh left Walmart's employment, he refused to return his Walmart computer, copied its contents, moved those documents onto his personal computer, commingling Walmart's proprietary information with his own. After months of negotiation, Mr. Huynh determined that he would prefer to give all of his non-privileged documents to Walmart, rather than engage in a substantive review of the hundreds of thousands of documents he had stolen. The Return of Assets Agreement between the parties provided that Plaintiff would withhold only documents of a purely personal nature from production. Defendants disagree with Plaintiff's characterization of the Bezos letter, which in any event was commingled with files from Plaintiff's Walmart-issued laptop.

- 4 -

Walmart agreed the allegations made by Plaintiff are serious because documents produced by Walmart indicated there were communications among Walmart's Elites on the seriousness of Plaintiff's complaint. Additionally, Plaintiff believes these allegations are serious for three reasons: 1) They were made against a Fortune One Company with over half a trillion dollars in annual revenue, 2) Walmart's Elites had committed fraud against shareholders, and 3) Walmart's stock seemed to have appreciated by roughly 70% and its Market Capitalization by over $100 Billion during the alleged-misconduct period. To date, Walmart had not produced one shred of evidence that it had conducted a thorough investigation into Plaintiff's allegations because Walmart leveraged the same playbook used in Mexico over a decade ago to cover up serious misconducts by Walmart's Top Echelons.

The investigation into Plaintiff's allegations was a phantom exercise done hurriedly by the local business in San Bruno, CA (i.e. letting the fox guard the hen house) to sweep Walmart's misconducts under the rug in order to run out the 5 year statute of limitation clock to avoid potential civil and/or criminal proceedings against the company in the future. Since Walmart were not able to prove that Plaintiff's allegations were unsubstantiated, Walmart resorted to character assassination against Plaintiff to silence him into submission. To achieve this, Walmart's RFP SET TWO attempted to collect information from Plaintiff's previous employers, specifically Amazon which included Plaintiff's email to Jeff Bezos, to portray that Plaintiff had a pattern of making unsubstantiated allegations against previous employers. Allegation made by Plaintiff against one company for the right reasons is not a pattern at all for a career that has spanned over 30 years. Walmart falsely concluded that Plaintiff is not trust worthy therefore his allegations against Walmart must be unsubstantiated.

However, the only piece of evidence that Walmart provided to prove that it did nothing wrong was a self-serving statement made by Walmart's lead spokesman, Greg Hitt, on March 15, 2018, "The claims come from "a disgruntled former associate," who was let go as part of a broader workforce restructuring. We take allegations like this seriously and looked into them when they were brought to our attention. <u>The investigation found nothing to suggest that the company acted improperly</u>.". Paragraph 64 in Plaintiff's complaint discussed Walmart Marketplace assortment expansion (i.e. the total # of Marketplace SKUs) "was being met, at least in part, by improperly sacrificing quality by lowering

1  standards for product listings and then failing to properly monitor the "third-party" seller's performance, and product listings, through a robust control system after the seller went live on Wal-Mart's Marketplace". After Plaintiff filed his civil complaint on 3/15/2018, Walmart began to made changes to rectify the <u>seller and SKU quality issues</u> raised by Plaintiff then disclosed them to the investing public as follow: 1) "With respect to the 3P side, we've been also -- at the same time, we're adding new merchants, we've also <u>been culling merchants</u> back that haven't been delivering an exceptional experience. And so, we're really focused on making sure that <u>each SKU that we</u> sell and each merchant we bring onboard can deliver a great experience." Dough McMillon on 6/1/2018, and 2) "Moving over to the long tail, let's just start with marketplace. Marketplace, we were adding SKUs really fast if you remember, it just got to like 70 million SKUs last year. <u>We're adding so fast that we hadn't really kept a very high bar in terms of the quality of the SKUs and quality of merchants on the site</u>. So last year we took a breather. We added more than 20 million SKUs to marketplace, but at the same time we took down about an equal amount. So, the overall quantity didn't change but the quality did" Marc Lore, on 10/16/2018. Based on the above disclosures, the statement made by Greg Hitt on 3/15/18 was misleading to the investing public, the SEC, and other governmental agencies as <u>it is hard to imagine</u> why Walmart would go out of its way <u>to rectify the seller and SKU quality issues</u> raised by Plaintiff if his allegations were found to be unsubstantiated.

It was hypocritical of Walmart to mislead this Court and requested Plaintiff to produce the Jeff Bezos letter and documents regarding Plaintiff's termination from Amazon when in fact Walmart had violated the return of asset agreement it had signed with Plaintiff where Plaintiff agreed to send Walmart the content of his personal lap top hard drive which includes both material he kept while employed at Walmart to support his current claims as well as his personal files. Plaintiff specifically put in an amendment to the asset return agreement to prevent Walmart from reading and using files that are not Walmart's Asset. Walmart not only looked at these files but actually brought a copy of Plaintiff's email to Jeff Bezos and other Amazon employment related documents to Plaintiff's Deposition on 5/20/2019 to question him. In summary, Plaintiff objects to Walmart's RFP SET TWO on the basis that it is irrelevant to the issues of fact and law relevant to the action.

## ARGUMENT

Under Section 806 of Sarbanes-Oxley, which is codified at 18 U.S.C. § 1514A. Enacted in the wake of the Enron and Arthur Anderson scandals. The employee bears the initial burden of making a prima facie showing of retaliatory discrimination and must prove by a preponderance of the evidence that (1) he engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she/he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action."

Walmart's RFP SET TWO seeks information and documents related to Plaintiff's allegations against Amazon for ethical violations, and antitrust violations as well as Plaintiff's personnel file to portray Plaintiff as not trust worthy and his allegations against Walmart are unsubstantiated i.e. Prong #1 of Plaintiff's prima facie is not defensible, and Prong #4 of Plaintiff's prima facie should be overturned because of his poor job performance at Amazon (although, Walmart refused to conduct a performance appraisal for Plaintiff in 2016 prior to his termination). Walmart's arguments are flaw on Prong #1 because Plaintiff only needs to show that he reasonably believes Walmart had violated the law(s), and on Prong #4, Plaintiff needs to prove his protected activity was a contributing factor in his termination.  However, for the avoidance of doubt, Plaintiff has proved below that Walmart's Elites have committed fraud against shareholders based on publicly available information. There are two sources of product listings on Walmart.com. The first came from Walmart.com own products (also known as first party/1P) and the second came from third-party sellers also known as 3P/Marketplace. Marketplace sellers listed their products on Walmart.com and pay Walmart a commission fee for each customer order sold.  Marketplace typically provided a significantly higher profit margin for Walmart than 1P/Walmart.com own products since they lacked the overhead and loss risks for Walmart. On 10/6/16, Brett Biggs, Walmart's CFO, stated "We'll also focus on accelerating ecommerce growth. Now this includes Marketplace, which can benefit the profitability mix of the e-commerce business.".

It is material when Walmart's Top Echelons made misleading statements regarding the total number of SKUs/Products on Walmart Marketplace as it would influence the judgement of a reasonable investor.  Analyst investment reports issued during the misstatement period often cited Walmart's inflated total number of Marketplace SKUs as a basis for their favorable views of Walmart and one of the key reasons for their recommendations of Walmart's stock to investors.

The FY16 10K report stated "Walmart.com experiences on average 85 million unique visits a month and offers access to approximately 8 Mil SKUs at beginning of the year. Paragraph 62 in the complaint stated Marketplace had 6.2 Mil SKUs at beginning of year (Lore and McMillon were on the email update). This implied that 1P had 1.8 Mil SKUs.  However, on the Q2 FY17 conference call Dough McMillon stated Marketplace had 8 Mil SKUs at beginning of year. It appeared he had misleadingly classified 1P SKUs as Marketplace to inflate the total # of Marketplace SKUs by 1.8 Mil.

On 10/6/2016, Lore said "There's 20 million products on walmart.com.".  Paragraph 62 in the complaint stated Walmart Marketplace had 16.5 Mil SKUs in early Oct 2016 (Lore and McMillon were on the email update). This implied 1P had roughly 3.5 Mil SKUs. On 10/6/2016, Dough McMillon said "Here in October, we have 20 million items on the Marketplace".  It appeared that Mr. McMillon had misleadingly classified 1P SKUs as Marketplace to inflate the total # of Marketplace SKUs by 3.5 Mil.

In summary, Walmart's Elites have made misleading statements to the investing public regarding the total number of Marketplace SKUs (knowing that investors and investment analysts relied on this metric to make investment decisions)  by 1) Misleadingly classified 1P SKUs as Marketplace, and 2) Stuffed its catalog with low quality products from low quality sellers (see page 5 and 6).

Walmart's Top Echelons terminated Plaintiff's employment to conceal the facts that they had committed fraud against shareholders and failed to fulfill their fiduciary duties to shareholders to perpetuate their "Fat Pay" package with hundreds of millions of dollars in stock and cash compensation. In FY18, Dough McMillion was paid 1,188 times as much as a median salary employee at Walmart.

According to Walmart's Annual Report filed with the SEC, Walmart paid Marc Lore 18% in cash and 82% in Walmart's stocks (3.55 Million shares) vested over five years for his ownership stake in Jet.com.  At today's stock price of $101.5/share, Marc Lore's Walmart stock holding valued at over $350 million dollars. This was precisely the reason why Marc Lore didn't expand the investigation into Plaintiff's complaint after he received Plaintiff's email complaint at 8:00 AM on 1/4/2017 despite the serious allegations. At 4:40 PM on the same day, Plaintiff received an out-of-the blue email from Walmart stated "investigation is now complete, and appropriate action has been taken in response to your concerns." Marc Lore stands to lose hundreds of millions of dollars if Walmart's investigation substantiated Plaintiff's allegations and he was to be terminated by Walmart for cause.