GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR., SBN 132099
  tboutrous@gibsondunn.com
RACHEL S. BRASS, SBN 219301
  rbrass@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

GIBSON, DUNN & CRUTCHER LLP
RYAN STEWART (*pro hac vice*)
  rstewart@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.530.9606

*Attorneys for Defendants*,
   WALMART INC.
   WAL-MART ASSOCIATES, INC.
   WAL-MART.COM USA, LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRI HUYNH,<br><br>           Plaintiff,<br><br>      v.<br><br>WAL-MART STORES, INC., a Delaware Corporation; WAL-MART ASSOCIATES, INC., a Delaware Corporation; WAL-MART.COM INC., a Delaware Corporation; and DOES 1 through 50, inclusive.<br><br>           Defendants. | Case No. 3:18-cv-01631-VC (SK)<br><br>**DEFENDANTS' MOTION FOR SPOLIATION SANCTIONS**<br><br>Hearing Date:  November 7, 2019<br>Hearing Time: 10:00 a.m.<br>Hearing Location: Courtroom 4, 17th Floor<br><br>Complaint Filed:    March 15, 2018<br>Trial Date:             February 10, 2020 |

## NOTICE OF MOTION AND MOTION FOR SPOLIATION SANCTIONS

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on November 7, 2019, at 10:00 a.m., or as soon thereafter as the matter may be heard before the Honorable Vince Chhabria in Courtroom 4, 17th Floor, of the United States District Court for the Northern District of California, in the San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, California, 94102, Defendants Walmart Inc., Wal-Mart Associates, Inc., Wal-Mart.com USA, LLC ("Defendants" or "Walmart"), through the undersigned counsel, will and do move this Court, pursuant to Federal Rule of Civil Procedure 37 and under the Court's inherent powers, for spoliation sanctions against Plaintiff Tri Huynh.

Defendants' Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the accompanying Declaration of Rachel S. Brass dated September 20, 2019 ("Brass Decl."), together with Exhibits, any other matters of which the Court may take judicial notice, other documents on file in this action, and any oral argument of counsel.

Dated:  September 20, 2019            GIBSON, DUNN & CRUTCHER LLP

By: _____*/s/ Rachel S. Brass*_____
        Rachel S. Brass

Attorneys for Defendants Walmart Inc., Wal-Mart Associates Inc., and Wal-Mart.com USA, LLC.

## TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................................ 1

II. BACKGROUND ................................................................................................................ 1

    A. Plaintiff Struggles At Walmart And Builds A False Narrative To Protect Himself From Termination .................................................................................... 2

    B. Plaintiff Decides He Has A Legal Claim Against Walmart ................................... 3

    C. Plaintiff Retains His Walmart-Issued Laptop And Intentionally Takes A Hammer To A Hard Drive Containing Documents Relevant To This Litigation ................................................................................................................ 4

    D. Plaintiff Fails To Take Proper Steps To Preserve Relevant Evidence ................... 6

III. ARGUMENT ..................................................................................................................... 9

    A. Plaintiff's Preservation Obligation Arose No Later Than January 2017 ............... 9

    B. Plaintiff Acted With A Culpable State Of Mind .................................................. 10

    C. The Lost Evidence Was Relevant To The Claims And Defenses In This Action ..................................................................................................................... 12

    D. Plaintiffs' Spoliation Warrants The Imposition of Sanctions .............................. 13

IV. CONCLUSION ................................................................................................................ 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexander v. Nat'l Farmers Org.*,
   687 F. 2d 1173 (8th Cir. 1982)...........................................................................................12

*Anheuser–Busch, Inc. v. Natural Beverage Distribs.*,
   69 F. 3d 337 (9th Cir. 1995)................................................................................................13

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
   881 F. Supp. 2d 1132 (N.D. Cal. 2012) ....................................................................9, 13, 14

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
   888 F. Supp. 2d 976 (N.D. Cal. 2012) ...........................................................................9, 10

*United States ex rel. Berglund v. Boeing Co.*,
   835 F. Supp. 2d 1020 (D. Or. Dec. 13, 2011) .....................................................................11

*Clear-View Technologies, Inc. v. Rasnick*,
   2015 WL 2251005 (N.D. Cal. May 13, 2015) ..............................................................12, 13

*Day v. Staples, Inc.*,
   555 F. 3d 42 (1st Cir. 2009) .................................................................................................1

*Food Serv. of Am., Inc. v. Carrington*,
   2013 WL 4507593 (D. Ariz. Aug. 23, 2013) .....................................................................12

*Lee v. Trees, Inc.*,
   2017 WL 5147146 (D. Or. Nov. 6, 2017)..........................................................................11

*Leon v. IDX Systems Corp.*,
   464 F. 3d 951 (9th Cir. 2006)...........................................................................1, 10, 11, 14

*Nursing Home Pension Fund v. Oracle Corp.*,
   254 F.R.D. 559 (N.D. Cal. Sept. 6, 2008)..........................................................................10

*United States v. Kitsap Physicians Serv.*,
   314 F. 3d 995 (9th Cir. 2002).......................................................................................10, 12

*Veolia Transp. Services, Inc. v. Evanson*,
   2011 WL 5909917 (D. Ariz. Nov. 28, 2011) .....................................................................13

*Wadler v. Bio Rad Labs., Inc.*,
   No. 3:15-CV-2356-JCS (N.D. Cal. Feb. 3, 2017), Dkt. 217...............................................14

*Webster v. Psychiatric Medical Care, LLC*,
   2019 WL 2300634 (D. Mont. May 30, 2019) ....................................................................10

**Statutes**

18 U.S.C. § 1514A ......................................................................................................................14

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Cal. Lab. Code, § 1102.5 ................................................................................................................ 14

**Rules**

Fed. R. Civ. P. 37(e) ....................................................................................................................... 13

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Plaintiff Tri Huynh is a former Walmart employee who, after a series of increasingly serious performance and workplace misconduct issues, ultimately lost his job in connection with a 2017 reduction in force ("RIF").  He subsequently filed this lawsuit asserting that he was wrongfully terminated.  However, discovery has revealed that Plaintiff, well aware that he faced imminent termination either for cause or because he was first in line for inclusion in a widely anticipated RIF, plotted to save his job or set up a legal claim by raising false allegations of disability discrimination and engaging in sham whistleblowing.  Dkt. 113, Defendants' Motion for Summary Judgment, at 11-13 ("MSJ").

Unfortunately for Plaintiff, discovery has uncovered not only his deplorable behavior before termination, but his attempts to hide evidence in this litigation.  Specifically, he has:

- § destroyed a hard drive containing files related to his Walmart employment;
- § failed to retain text messages and altered those he did retain; and
- § deleted emails detailing communications with other Walmart coworkers discussing his termination.

Each of these acts was intentional and served to deny Defendants access to documents and other relevant information.  Where, as here, the documents and information that were not destroyed have undermined Plaintiff's claims at every turn, an inference that Defendants were prejudiced by the destruction is warranted.  *See, e.g.*, *Leon v. IDX Systems Corp.*, 464 F. 3d 951, 959-960 (9th Cir. 2006).  Accordingly, Defendants respectfully request that the Court sanction Plaintiff through an adverse inference instruction regarding the basis for his Sarbanes-Oxley Act, California Whistleblower Protection Act, and derivative public policy claims—specifically, that Plaintiff did not have a "reasonable" belief, or even a "genuine" belief, held in "good faith," that he was reporting conduct that violated the law.  *See Day v. Staples, Inc.*, 555 F. 3d 42, 54 (1st Cir. 2009).

**II. BACKGROUND**

When Plaintiff learned that his job was in danger, he began taking steps to protect himself, by choosing to strategically disclose his ADHD diagnosis and assembling a baseless ethical complaint

against Walmart. *See* MSJ at 3-13. His apparent objective was to cloak himself with legally protected status (as a whistleblower and a disabled person), in the vain hope that doing so would ensure his continued employment. That plot has now been exposed, but the depths of Plaintiff's scheme are lost in his spoliation of evidence.

### A. Plaintiff Struggles At Walmart And Builds A False Narrative To Protect Himself From Termination

Plaintiff's performance difficulties at Walmart began relatively early in his tenure. Huynh's original supervisor identified problems with Plaintiff's ability to work productively with his coworkers. *See* MSJ at 4. This was reflected in Huynh's 2015 performance review, which pointed out communication issues that hampered his ability to "collaborat[e]" with others. Dkt. 117, Trembley Decl. ¶ 20. Accordingly, he advised that Huynh "adjust his approach" to "collaboration" and "communication" going forward. *See id.* Plaintiff, however, did not internalize this feedback, and instead continued to repeat the mistakes that were reflected in his 2015 review. *See* MSJ at 4.

In January 2016, one of Huynh's direct reports raised an internal complaint that he had created a "hostile work environment." That person described Plaintiff's leadership as "blatantly unprofessional," and charged him with "belittl[ing]" and "berat[ing]" her. Dkt. 117, Trembley Decl. ¶ 21. Walmart HR investigated and substantiated much of her complaint. HR concluded that Plaintiff's management style was "pushy, aggressive and demanding," and issued a verbal warning to him. *See id.* at ¶ 24.

By May 2016, Plaintiff knew he was in trouble. Not only had he been the subject of a substantiated hostile work environment investigation, but also the subject of a 360-degree performance review that further substantiated his difficulties working with others. Dkt. 115, Ricetti Decl. ¶ 9-11. Accordingly, Plaintiff devised a plan to "strateg[ically]" disclose his ADHD diagnosis. *See* MSJ at 6 (citing Stewart Decl., Ex. 124). As he wrote to a workplace confidante at the time, this was a "defensive strategy" that would allow him to "play with [Walmart] on [his] own terms" and make his supervisor "have to back [him] up" despite the negative results. *See* MSJ at 6. To implement this strategy, Plaintiff prepared a PowerPoint presentation describing his ADHD diagnosis, which he presented to HR as well as to his new supervisor on the same day that he

received the results of his 360-degree review. *See id.*

In the fall of 2016, Plaintiff continued to have serious performance issues, and engaged in misconduct so egregious that, after an independent HR investigation, he received a written warning. *See* MSJ at 7-8. As Plaintiff understood at the time, the consequences of any written warning were dire. *See* MSJ at 10. Moreover, in the same period, Walmart had acquired Jet.com and planned a company-wide reorganization, which was widely understood—including by Plaintiff—to include a reduction in force. *See* MSJ at 9. Plaintiff was well aware his job was at risk; he testified that he "suspect[ed] that his employment at Walmart may be terminated" as early as November 2016. *See* MSJ at 10.

Once again, Plaintiff took measures to protect his job. This time, Plaintiff developed a "whistleblower" ethics complaint raising purported violations of financial and securities laws. *See* MSJ at 11-12. This too was a "strateg[ic]" move, methodically planned. In notes he prepared to himself while he drafted the ethics complaint, Plaintiff described the need to develop "supporting facts" and a "story deck" that would ensure he had done "enough to raise a reasonable doubt." *See* MSJ at 11 (citing Dkt. 119, Stewart Decl., Ex. 121). And, as a backstop measure, he again raised his ADHD, alleging that his supervisors were "biase[d]" against him due to that condition. *See* MSJ at 11 (citing Beal Decl. ¶ 40).[1]

Neither action saved Plaintiff's job. But Plaintiff's actions did lay the foundation for this lawsuit. Almost immediately after his termination in January 2017, Plaintiff began meeting with attorneys to pursue claims against Walmart. Brass Decl. ¶ 11, Exh. 3, Tr. 21:14-22:13.

**B.  Plaintiff Decides He Has A Legal Claim Against Walmart**

Plaintiff was notified that his employment would be terminated in the RIF on January 10, 2017. *See* MSJ at 13. He concluded at this meeting that he had been, in his words, "wrongfully terminated" by Walmart and within days, began contacting attorneys about a potential lawsuit related

---

[1] Huynh's lawsuit alleged ADHD-related claims, including disability discrimination, retaliation, failure to accommodate, and failure to engage in the interactive process. Dkt. 8, ¶¶ 141-188. In his deposition, however, Huynh conceded that he never requested or required any accommodation for his ADHD, because he felt his ADHD made him a better employee. Brass Decl. ¶ 11, Exh. 3, Tr. 212:4-213:13. Ultimately, he conceded the ADHD-related claims were meritless and stipulated to their dismissal with prejudice. Dkts. 81, 84.

to his termination. Brass Decl. ¶ 11, Exh. 3, Tr. 21:19-22:13. Accordingly, there is no dispute that no later than January 2017, Plaintiff anticipated filing a wrongful termination lawsuit against Walmart. Brass Decl. ¶ 11, Exh. 3, Tr. 22:3-7.

### C. Plaintiff Retains His Walmart-Issued Laptop And Intentionally Takes A Hammer To A Hard Drive Containing Documents Relevant To This Litigation

Plaintiff received a Walmart-issued laptop as part of his employment, which was to be returned to Walmart after he was terminated in January 2017. Brass Decl. ¶ 11, Exh. 3, Tr. 253:23-254:11; *see* Dkt. 116, Ha Decl. ¶ 24. But rather than giving his laptop to the company on his last day of work, or immediately sending it back, Plaintiff secretly took steps to secure a copy for himself. He copied the contents of the laptop to a separate hard drive—a violation of the terms of his employment. Brass Decl. ¶ 11, Exh. 3, Tr. 254:12-14. He then kept the laptop for over three months at his residence in Washington, at which time Walmart sent Plaintiff a shipping label and offered to reimburse him for any expenses related to properly packaging it for shipment to Walmart's offices in San Bruno. *See* Dkt. 116, Ha Decl. ¶ 25. Rather than properly secure and ship the computer, however, in an act of spite, Plaintiff placed it in an unprotected paper envelope, which resulted in severe damage in transit. *See* Dkt. 116, Ha Decl. ¶ 26. He did this because he was "really angry at Walmart." Brass Decl. ¶ 11, Exh. 3, Tr. 255:22-25 (testifying that he had "no time" to package the laptop because "it is not my job to do anything extra for Walmart").

Having intentionally caused the damage to his Walmart-issued laptop, while securing a copy for himself, Plaintiff then transferred the contents of the hard drive containing the stolen documents to his personal laptop, and "destroyed" the hard drive. Brass Decl. ¶ 11, Exh. 3, Tr. 256:2-6. In Huynh's own words, he "remember[ed] just hitting [it] with [a] hammer and smash[ing] it and make sure that nobody can read it." Brass Decl. ¶ 11, Exh. 3, Tr. 256:2-12. He then transferred the files from his personal laptop (which he later discarded) to thumb drives, which he gave to his attorney. Brass Decl. ¶ 11, Exh. 3, Tr. 256:13-19. No Walmart laptop, no hard drive, and no personal laptop survived.

When Defendants eventually learned that Plaintiff had retained the contents of his Walmart laptop in contravention of Walmart policy, they asked for the immediate return of all such documents

1  and information, first in a series of letters to Plaintiff (and his then-counsel), and later through
2  document requests seeking information from the laptop relevant to Plaintiff's Walmart employment.
3  Brass Decl. ¶¶ 3-5.  Instead of complying, which would have been a straightforward exercise,
4  Plaintiff and his then-counsel delayed, and interposed any number of excuses, but did not return the
5  copies he created and retained.  Brass Decl. ¶ 5.  Defendants first asked for their own files in June
6  2018; it took until late April 2019, nearly a year later, for Plaintiff to agree to produce them.  Brass
7  Decl. ¶¶ 3, 7.

8  When Defendants finally received those files, it was clear that Huynh had been withholding
9  evidence that damaged his claims.  For example, Defendants discovered that Plaintiff had not
10 produced a document he had created on his Walmart laptop discussing his reaction to the written
11 warning.  Brass Decl. ¶ 9.  That file revealed that Plaintiff's ethics complaint, which he styled in the
12 Complaint in this litigation as an honest concern about Walmart's accounting practices, was instead a
13 "strateg[ic]" maneuver to save his job—indeed, Plaintiff wrote out the "what," "how," and "when" of
14 his "whistleblowing" plan, including planned media outreach and legal engagement strategy.  *See*
15 MSJ at 6.  To this day, Huynh has never produced this document, or otherwise acknowledged it in his
16 discovery responses.  Brass Decl. ¶ 9.

17 This was not the only incriminating document Defendants identified in the materials Plaintiff
18 had stolen and long refused to return.  The laptop files contained a selection of text messages between
19 Plaintiff and his confidante, another co-worker at Walmart, which showed that his ADHD disclosure
20 also was a "defensive strategy" that would allow him to "play with [Walmart] on [his] own terms"
21 and make his supervisor "have to back [him] up" despite the negative results of his 360-degree
22 review.  Brass Decl. ¶ 8, Exh. 2; *see* MSJ at 6.  The messages wholly contradicted Plaintiff's
23 disability discrimination claims (five counts of the Complaint he filed in this Court), stating that he
24 was "not ashamed" of his ADHD, believing that it was "why [he] got shit done."  Brass Decl. ¶ 8,
25 Exh. 2.  Plaintiff did not include this document in his GO71 production, and ultimately produced it
26 months after Defendants identified it in the returned documents, produced it, and used it in his
27 deposition.  Brass Decl. ¶ 8.
28 The laptop files also contained documents and materials related to Plaintiff's prior

employment at Amazon.com, and the circumstances surrounding his separation of employment there. That included a letter Plaintiff wrote to Jeff Bezos, Amazon.com's CEO. Brass Decl. ¶ 10. The letter was dated just before Amazon terminated Plaintiff (and right after he had received a negative performance review), and in it Huynh asserted charges of wrongdoing parallel to the ones he has lodged against Defendants in this case. MSJ, Stewart Decl., Ex. 117. Despite the clear responsiveness to Defendants' discovery requests, Plaintiff had not produced the letter or other key documents regarding his employment at Amazon. When deposition and other discovery made clear that additional Amazon.com-related documents once existed, including the Performance Improvement Plan he was placed on before his termination and his severance agreement, he first denied, under oath, that any written performance feedback existed and later acknowledged in a June 4, 2019 meet and confer call that it had once existed but that he no longer had copies. Brass Decl. ¶¶ 11, 13, Exh. 3, Tr. 69:3-11.

It is impossible to say whether Huynh created similar documents or sent similar correspondence that was not produced, because he consciously decided to destroy the original repositories for such documents.

### D.  Plaintiff Fails To Take Proper Steps To Preserve Relevant Evidence

Plaintiff has also failed to preserve other potentially significant sources of evidence: his mobile phone and personal email accounts.

#### 1.  Plaintiff Fails To Preserve Evidence On His Cell Phone

Huynh took no steps to preserve evidence on his cell phone. Mr. Huynh determined in January 2017 that he anticipated filing a lawsuit, but he has admitted that he backed up his mobile device only once, using "text archiving software." Brass Decl. ¶ 16, Exh. 7 (describing 2017 "back up" of mobile phone). This software did not preserve any images attached to text messages sent or received by Plaintiff, nor did it retain attachments such as video and audio files. Huynh says that after that backup, his "phone crashed" in late 2017, permanently deleting the original record of text messages. Brass Decl. ¶¶ 16, 18, Exh. 7, Exh. 9, Tr. 9:23-10:8. Compounding matters, he took no steps whatsoever to try to salvage the phone's contents after it crashed. Brass Decl. ¶ 18, Exh. 9, Tr. 10:9-13. When pressed on this event, he testified, "Well, my phone crashed and it doesn't work. I

1   mean, that's all I can say." Brass Decl. ¶ 18, Exh. 9, Tr. 9:4-10:1.  This too affected what was

2   produced by Huynh in discovery—the few files retained and produced appear to contain significant

3   gaps or are missing potentially critical images and attachments.

4        For example, certain texts are missing critical components.  A March 27, 2017 text from one

5   of Plaintiff's former co-workers states "Good for Walmart!"—a *non sequitur* given that there is no

6   preceding reference to Walmart in the preceding text messages.  Brass Decl. ¶ 15.  In another

7   instance, a different co-worker sends a series of text messages to Plaintiff just seven days after

8   Plaintiff's termination but no responding messages were produced, even though the context suggests

9   a conversation was taking place.  Brass Decl. ¶ 15; *see also* Brass Decl. ¶ 11, Exh. 3, Tr. 205:4-10

10  (describing post-termination communications).  The manner in which these text messages were

11  produced makes it impossible to determine whether there were other parties to these communications

12  or whether the content of the text messages was deleted or modified.

13       Other text messages are missing patently relevant attachments.  These missing files include at

14  least 39 attachments to text messages to or from Plaintiff's then current and former co-workers that

15  discuss Walmart's reduction in force and Plaintiff's potential lawsuit against Walmart.  Brass Decl.

16  ¶ 15.  For instance, two of these attachments, which Plaintiff called his 60- and 120-second pitches,

17  reflect what he described as "my story of how Walmart wrongfully terminated me," Brass Decl. ¶ 15,

18  Tr. 18:11-19.  One text Plaintiff sent to his confidante on January 12, 2017, just two days after his

19  termination, asked her to "please review and give feedback on my 60 second pitch."  Brass Decl. ¶

20  15; Exh. 6, Exh. 9, Tr. 18:11-19.  Another, sent by Plaintiff later that day, read: "New pitch please

21  review and give feedback," attaching his "120 second pitch."  Brass Decl. ¶ 15; Exh. 9, Tr. 18:11-19.

22  Neither the 60-second pitch nor the 120-second pitch were preserved by Plaintiff's archiving

23  software, and Plaintiff could provide no further detail on the content of either attachment during his

24  deposition.  Brass Decl. ¶ 15; Exh. 9, Tr. 18:11-19:6.

25       Finally, the text messages produced by Plaintiff have an inexplicable eight-month gap, from

26  May 2, 2016 to January 11, 2017 (one day after Plaintiff was terminated), a period for which he has

27  not produced a single text message.  Brass Decl. ¶ 15.  This gap corresponds to the last eight months

28  of Plaintiff's employment by Walmart—a critical period in light of the actions he took during that

period to avoid termination.  Defendants became aware of Plaintiff's failure to produce responsive text messages because of a file that they found on his Walmart-issued laptop.  This file was a compilation of selected text messages that Plaintiff had exchanged with his Walmart confidante in May 2016 regarding his ADHD disclosure.  Brass Decl. ¶ 8, Exh. 2.  Plaintiff's production includes this same conversation but omits several of the messages that were found on his PC.  Brass Decl. ¶¶ 8, 15.  The final text messages in this file—which are not in Plaintiff's production—are dated May 6, 2016, four days *after* the May 2, 2016 text messages that Plaintiff produced.  Brass Decl. ¶ 8.

### 2. Plaintiff And His Wife Provide Contradictory Testimony About Plaintiff's Cell Phone

The picture surrounding Plaintiff's cell phone (or phones) was also further clouded by recent deposition testimony in this matter.  Through the course of discovery in this action, Plaintiff has tied his failure to make a meaningful production of text messages to the fact that his former cell phone "crashed" in late 2017, which required him to purchase a second device to replace it.  Brass Decl. ¶ 16, Exh. 7, Exh. 9, Tr. 8:19-9:22.  On August 30, 2019, Defendants deposed Plaintiff's wife, Loanne Huynh, who testified that she recalled Plaintiff having only one cell phone.  Brass Decl. ¶ 19, Exh. 10, Tr. 60:3-12.  Defendants asked Plaintiff to clarify this discrepancy shortly after the deposition, but rather than conclusively resolving the issue, he stated in an email that he did not have "any updates" for Defendants on this point.  Brass Decl. ¶ 20, Exh. 11.

### 3. Plaintiff Fails To Preserve Relevant Emails

The few text messages Plaintiff did back-up and has produced refer to *emails* that he also has not produced in this action.  Specifically, Plaintiff has produced certain emails and text messages with a Walmart co-worker whose employment was also ended in the RIF.  Text messages exchanged between Plaintiff and the co-worker make references to emails between the two between January and March 2017 that are contemporaneous with Plaintiff's termination.  In one text message, sent January 28, 2017, Plaintiff states that he emailed her a case about Walmart.  Brass Decl. ¶ 15, Exh. 6. Another text message, dated March 23, 2017, references an email from her to Plaintiff.  *Id*.  Plaintiff has not produced copies of either of the referenced emails, stating in correspondence to Defendants dated August 19, 2019 that these items "could not be located."  Brass Decl. ¶ 17, Exh. 8.

### 4. Plaintiff Fails To Disclose His Ten Other Computers

Plaintiff also has apparently failed to disclose the full collection of computers and other sources of ESI in this case. During the course of discovery in this action, Plaintiff represented to Defendants that he searched a personal laptop for documents and information responsive to Defendants' document requests. Brass Decl. ¶ 19. However, Mrs. Huynh testified that Plaintiff had ten or more *other* computers at his Washington residence. Brass Decl. ¶ 19, Exh. 10, Tr. 44:5-21, 59:18-60:2. None of these computers was disclosed by Plaintiff as potentially having relevant documents or information. Brass Decl. ¶ 19. When Defendants sent a follow-up email a few days later asking Plaintiff whether these computers were searched for responsive documents, he responded that he had no "updates" for Defendants on this issue. Brass Decl. ¶ 20, Exh. 11.

## III. ARGUMENT

Where a party has failed to preserve or has destroyed evidence, as occurred here, the Court considers a three-part test to determine whether sanctionable spoliation has occurred: "[an opposing] party seeking an adverse inference instruction (or other sanctions) based on the spoliation of evidence must establish the following three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense [i.e. a claim or defense of the party seeking sanctions]." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 881 F. Supp. 2d 1132, 1135 (N.D. Cal. 2012) (internal citation omitted). Here, there is ample evidence satisfying all three prongs, and a spoliation sanction is therefore warranted.

### A. Plaintiff's Preservation Obligation Arose No Later Than January 2017

The duty to preserve evidence comes into being when a litigant is put on notice that future litigation is possible. This is "an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 888 F. Supp. 2d 976, 990 (N.D. Cal. 2012). Here, Plaintiff was aware of his potential claim against Walmart in January 2017, when he asserted he was "wrongfully terminated" by Walmart and began seeking legal

1   representation.  This is consistent with *Apple* and other cases in the Ninth Circuit holding that the
2   duty to preserve comes into being when a "potential claim is identified."  *See id*. at 991; *Webster v.*
3   *Psychiatric Medical Care, LLC*, 2019 WL 2300634, at *3 (D. Mont. May 30, 2019) (holding that
4   duty to preserve evidence arises at the time of an employee's discharge).  Indeed, given Plaintiff's
5   plot to protect himself from termination, Plaintiff likely foresaw litigation well before he even
6   consulted an attorney in January 2017.  In any event, no later than January 2017, Plaintiff's duty to
7   preserve evidence was triggered, a duty violated by his failure to preserve, or his affirmative
8   destruction of, multiple sources of electronic evidence and information after that date.

### B.     Plaintiff Acted With A Culpable State Of Mind

Destruction of evidence is done with a culpable state of mind if the party has "some notice that the documents were potentially relevant to the litigation before they were destroyed."  *United States v. Kitsap Physicians Serv*., 314 F. 3d 995, 1001 (9th Cir. 2002) (emphasis added) (internal quotation marks and citation omitted); *Nursing Home Pension Fund v. Oracle Corp*., 254 F.R.D. 559, 565-66 (N.D. Cal. Sept. 6, 2008) (granting adverse inference where party was likely aware that failure to preserve hard drive would result in lost evidence).  It is clear that files stored on Plaintiff's Walmart-issued laptop, not to mention his text message and email communications with his co-workers, were highly relevant to his action against Walmart.  His mishandling of the return of that laptop and subsequent destruction of a hard drive containing copies of the laptop files were, in his own words, intentional acts.  Similarly, his failure to preserve clearly relevant text messages and emails resulted in the loss of information Plaintiff had good reason to believe was tied to his claim.  All of these acts took place *after* Plaintiff had begun to build his case against Walmart, a fact he acknowledged in his deposition, stating that he started to "keep a record" in December 2016 of documents that might be relevant if he were to be terminated.  Brass Decl. ¶ 11, Exh. 3, Tr. 214:9-24.  His motivation is unmistakable.

The Ninth Circuit's decision in *Leon v. IDX Systems Corp.* is on all fours with the present case.  464 F.3d at 959.  In *Leon*, an employment discrimination action, the plaintiff deleted information (which he characterized as "personal") stored on his employer-issued laptop, claiming that he wanted to protect his privacy, and notwithstanding the fact that litigation was pending

regarding his dismissal. *See id.* at 958-59. The employer moved for terminating sanctions, arguing that the plaintiff's deletion of files that were likely relevant to the employer's decision to terminate him was willful spoliation, and the district court granted the motion. *See id.* at 957. In affirming the imposition of terminating sanctions, the Ninth Circuit found that once the plaintiff was aware that there would be litigation concerning employment discrimination, he was "on notice that files created on his employer-issued computer were relevant to a lawsuit centering on the existence of legitimate grounds for firing [him]." *See id.* at 959. His decision to delete files anyway was "indisputably intentional" and willful. *Id.* at 959-60.

Here, similarly, Plaintiff was on notice that each of the sources of information he damaged or destroyed was relevant to his claim against his employer. Plaintiff's Walmart-issued computer, a hard drive copy of that computer, and a personal computer that later held a full or partial copy as well were discarded, severely damaged, or smashed; and all contained critical information about his work at Walmart. There is no question Plaintiff destroyed each purposefully; indeed, he was unequivocal in this respect. Huynh testified that his decision to mail the laptop back in inadequate packaging was done because he was "really angry" at Walmart and that he destroyed the hard drive to "make sure that nobody can read it." These actions were deliberate destruction of evidence.

This conclusion is reinforced by Plaintiff's conduct with respect to relevant text messages. Plaintiff's failure to preserve his devices, his production of non-native, altered text messages, and his failure to preserve and produce responsive emails is the sort of willful conduct justifying sanctions in this Circuit. *See Lee v. Trees, Inc.*, 2017 WL 5147146, at *7 (D. Or. Nov. 6, 2017) (granting terminating sanctions where plaintiff "failed to preserve her phones and withheld the native, electronic versions of the text messages"); *United States ex rel. Berglund v. Boeing Co.*, 835 F. Supp. 2d 1020, 1049 (D. Or. Dec. 13, 2011) (finding willful spoliation despite party's claim that hard drive containing relevant information had "crashed"). Strikingly, Plaintiff does not dispute that he lost, destroyed, or altered relevant evidence, admitting, for example, that he destroyed a hard drive by "just hitting with [a] hammer and smash[ing] it." Brass Decl. ¶ 11, Exh. 3, Tr. 256:2-12. His pat explanation for the loss of text messages on his phone and for his later decision to dispose of the phone altogether is similarly cavalier: "Q. Can you describe what happened when your phone

crashed?  A.  Well, my phone crashed and it doesn't work.  I mean, that's all I can say."  Brass Decl. ¶ 18, Exh. 9, Tr. 9:23-10:13.  Courts regularly sanction conduct of the sort to which Plaintiff freely admits.  *See, e.g.*, *Clear-View Technologies, Inc. v. Rasnick*, 2015 WL 2251005, at *6-10 (N.D. Cal. May 13, 2015) (granting adverse inference where party failed to properly preserve emails and phone records).  Taken in total, Plaintiff's actions allow for only one conclusion: he willfully and intentionally destroyed information to avoid production of damaging documents.

### C.     The Lost Evidence Was Relevant To The Claims And Defenses In This Action

The Ninth Circuit has held that spoliation occurs where the documents lost are "*potentially relevant to the litigation. . .*"  *Kitsap Physicians Serv.*, 314 F. 3d at 1001 (emphasis added); *see also Food Serv. of Am., Inc. v. Carrington*, 2013 WL 4507593, at *21 (D. Ariz. Aug. 23, 2013) (documents are relevant if they relate to claims or defenses).  No more is required because "the relevance of ... [destroyed] documents cannot be clearly ascertained because the documents no longer exist."  *See Alexander v. Nat'l Farmers Org.*, 687 F. 2d 1173, 1205 (8th Cir. 1982).  Here, there is ample evidence to suggest that Plaintiff destroyed evidence that bore on his claims or Walmart's defenses.

Take the intentional damage to Plaintiff's Walmart-issued laptop and the subsequent intentional destruction of copies of that device.  There can be no question it contained files central to Walmart's defense in this action, from documents that show whether he engaged in legitimate whistleblowing, to information regarding when and how he learned of the items he raised to ethics, to documents bearing on whether he was performing well, or not.  In addition, the documents that were produced show Plaintiff created contemporaneous documents and wrote contemporaneous emails that contradict his claims here.  There is ample reason to believe the various intentionally destroyed devices and media contained more of the same.  Indeed, given Ms. Huynh's testimony that plaintiff had ten or more other computers, there can be no suggestion that his retention of the Walmart laptop was for any reason other than to collect what he deemed "favorable" evidence against Walmart; and that his subsequent intentional mishandling of it, and the utterly predictable resulting damage, were for any reason other than to keep unfavorable evidence from Walmart.

For example, there is no question that certain of the documents that survived the destruction

(but which Plaintiff did not voluntarily produce in this action) show that he reacted to his receipt of a written warning by immediately seeking to engage in "whistleblowing" with the intention of forestalling termination in the impending RIF. *See* MSJ at 11 (describing plan to develop "supporting facts" for a "story deck" that would be "enough to raise a reasonable doubt").

Likewise, some of those isolated text messages that survived to be produced in this litigation confirm that Huynh's ADHD disclosure was a tactical move, rather than a good faith request for an accommodation. Brass Decl. ¶ 8, Exh. 2 (explaining that he was "not ashamed" of his ADHD and because it was "why [he] got shit done" and allowed him to "see much farther into the future"). Another shows Huynh advising a subordinate facing termination that she could "protect [her]self" from firing and "survive" if she filed for "medical leave" status. *See* MSJ at 16.

The facts contained in these files all point to one conclusion: Plaintiff, faced with a documented record of poor performance and an imminent termination, chose instead to manufacture a contrived ethics complaint and weaponize his ADHD diagnosis to protect his job. These highly relevant files were located in repositories that Plaintiff failed to preserve or produce, in the case of his cell phone, or destroyed, in the case of his damaged Walmart laptop, and hard drive. Of course, because he did not retain these physical devices, there is no way for Defendants to determine what other files existed, or if the files produced had been modified. This compels a finding that the lost files from these sources were "relevant" for purposes of spoliation. *See Veolia Transp. Services, Inc. v. Evanson*, 2011 WL 5909917, at *4 (D. Ariz. Nov. 28, 2011) (relevance prong satisfied where "the spoliation itself and surrounding circumstances permit a fair inference that the evidence was highly relevant"); *see also Clear-View Techs.*, 2015 WL 2251005, at *8 ("the law presumes that spoliated evidence goes to the merits of the case and was adverse to the party that destroyed it.") (internal citation omitted).

### D.     Plaintiffs' Spoliation Warrants The Imposition of Sanctions

Federal Rule of Civil Procedure 37 and the Court's inherent power afford a range of options to address spoliation, from an award of attorneys' fees to dismissal. *See Apple Inc.*, 881 F. Supp. 2d at 1135; Fed. R. Civ. P. 37(e). Plaintiff's conduct is egregious enough to warrant dismissal, *see Anheuser–Busch, Inc. v. Natural Beverage Distribs.*, 69 F. 3d 337, 352 (9th Cir. 1995), or in the

alternative, an adverse inference at summary judgment and a jury instruction if this matter survives summary judgment and proceeds to trial.

In formulating a sanction, this Court is advised to elect one that will "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been absent the wrongful destruction of evidence by the opposing party." *Apple*, 881 F. Supp. 2d at 1136 (internal citation omitted). Both terminating sanctions and an adverse inference would achieve these purposes. *See Leon*, 464 F. 3d at 958 (explaining that terminating sanctions are warranted where "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings") (internal citation omitted); *see also Apple*, 881 F. Supp. 2d at 1138 (explaining when an adverse inference is warranted). If the Court elects to sanction Plaintiff by ordering an adverse inference, Defendants respectfully request that the Court order that it will enter two adverse inference instructions as follows:

> An employee engages in protected activity under the Sarbanes-Oxley Act if he makes a disclosure regarding conduct that he reasonably believes constitutes a violation of any rule or regulation of the Securities and Exchange Commission. You are instructed to presume that Plaintiff did not have a subjective belief – that is personally and in good faith – that the conduct he was disclosing constituted a violation of any rule or regulation of the Securities and Exchange Commission.

*See* 18 U.S.C. § 1514A; *Wadler v. Bio Rad Labs., Inc*., No. 3:15-CV-2356-JCS (N.D. Cal. Feb. 3, 2017), Dkt. 217, at 19-20 (Jury Instruction Nos. 18 and 19).

> An employee engages in protected activity under the California Whistleblower Protection Act if he makes a disclosure regarding conduct that he has reasonable cause to believe constitutes a violation of any federal or state statute. You are instructed to presume that Plaintiff did not have reasonable cause to believe – that is a personal and good faith belief – that the conduct he was disclosing constituted a violation of any rule or regulation of any federal or state statute.

*See* Cal. Lab. Code, § 1102.5. Defendants also request any additional sanction this Court deems appropriate.

### IV.     CONCLUSION

For the foregoing reasons, Defendants request that the Court enter an order granting terminating sanctions, or in the alternative, an adverse inference instruction to address the willful spoliation described above, and such other relief as the Court may deem appropriate.

DATED: September 20, 2019                          GIBSON, DUNN & CRUTCHER LLP


                                                   By:   /s/ *Rachel S. Brass*
                                                         Rachel S. Brass
                                                         Attorneys for Defendants Walmart Inc.,
                                                         Wal-Mart Associates, Inc., and Wal-
                                                         Mart.com USA, LLC